**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Kenneth BANKS, Defendant–Appellant.**

**No. 92–2956.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 2, 1993.

Decided March 4, 1993.

Andrew B. Baker, Jr. (argued), Ronald J. Kurpiers, Asst. U.S. Attys., Dyer, IN, for U.S.

David L. Chidester, Valparaiso, IN (argued), for Kenneth Banks.

Before CUMMINGS and FLAUM, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

CUMMINGS, Circuit Judge.

Kenneth Banks was convicted of maintaining a crack house and sentenced to 37 months in prison. 21 U.S.C. § 856(a)(1). On appeal he argues that the proof at trial varied from the allegations in the indictment, and that the district court improperly enhanced his offense level at sentencing. We affirm both the conviction and the enhancement.

## I. BACKGROUND

In October of 1991 Walter Shoulders was recruited from Detroit to come to Gary, Indiana, and sell crack. On arriving in Gary he met a man known as "J.R." who explained the operation of crack houses and told him the rules of the job. J.R. then took Shoulders to live in a house where all day and night, every day and night, he would sell crack to anyone who came by. In return he received ten to twenty dollars a day for food (which the house owner would procure since Shoulders was not allowed to leave), and was promised $2500 for four weeks' work.

After working at a few houses, Shoulders was transferred to defendant Banks' house at 2075 Roosevelt in Gary, where he continued to sell crack. J.R. and a man known as "Nuke" supplied Shoulders with

the drugs each day. They also cooked cocaine into crack in Banks' kitchen a few times each week. Further, they handled all the money made from the sales, giving Shoulders his food allowance out of the proceeds and paying for any repairs to the house. Apart from letting all of this go on in his home, Banks assisted by opening the door and identifying customers for Shoulders, waking him up when buyers came at odd hours, getting his food, picking up more crack, cooking crack on his stove, and making deliveries to friends. J.R. regularly paid Banks for his help and the use of the house. Banks also benefitted from the arrangement by sometimes instituting a kind of "cover charge"—those who wanted to smoke crack in his house had to buy some for him as well.

Local police and the DEA investigated the house and eventually raided it, catching Banks climbing out a rear window. A jury found him guilty of violating 21 U.S.C. § 846(a)(1), which makes it illegal to "knowingly open or maintain any place for the purpose of manufacturing, distributing, or using any controlled substance." The crime carries a base offense level of sixteen, which the district court increased by two under U.S.S.G. § 2D1.8(b).[1] At that time § 2D1.8(b) stated, "If a firearm or other dangerous weapon was possessed, increase by two levels." During the raid police had discovered a gun in Banks' kitchen, and even though someone else in the house was convicted of possessing it, the court found that Banks should also be held responsible.

Banks now claims that (1) the facts adduced at trial materially varied from the facts alleged in the indictment, requiring reversal of his conviction, and (2) the court should not have increased his offense level

under guideline § 2D1.8, since there was no evidence connecting him to the gun or the gun to the offense.

## II. DISCUSSION

### A. *Variance from the Indictment*

Banks seeks reversal of his conviction on the ground that the government proved a violation of 21 U.S.C. § 856(a)(2), rather than § 856(a)(1). Subsection (a)(1) makes it illegal to open or maintain a place in order to manufacture, distribute, or use drugs, while (a)(2) makes it illegal to provide a place for others to engage in the proscribed activities.[2] *United States v. Tamez*, 941 F.2d 770, 774 (9th Cir.1991); *United States v. Chen*, 913 F.2d 183, 190 (5th Cir.1990). Banks maintains that, at best, the government only proved that he was a landlord for dope-dealing tenants, which is an (a)(2) violation. Because the indictment refers only to (a)(1), he concludes that the proof varied from the crime charged, and that it was improper to allow the jury to convict him.

As the government correctly notes, this claim is not so much about a variance between the indictment and proof as it is a challenge to the sufficiency of the evidence. If there was enough proof to support a conviction under (a)(1), then the fact that there was also evidence of an (a)(2) violation would be irrelevant. And if there was not enough proof of an (a)(1) violation, then the conviction would have to be overturned regardless of any variance. *Cf. Berger v. United States*, 295 U.S. 78, 83, 55 S.Ct. 629, 631, 79 L.Ed. 1314 (1935) (a variation is not material if the allegation and proof substantially correspond); *Cooper v. United States*, 91 F.2d 195, 198 (5th Cir. 1937) ("If such a conspiracy as is alleged

---

1. Section 2D1.8 was amended in 1992 by substituting an entirely new subsection (b)(1). The same enhancement still applies, however, since the new § 2D1.8 refers to § 2D1.1 as the basis for determining offense levels, and § 2D1.1(b)(1) includes the two-level increase for possession of a firearm.

2. The full text of § 856(a) is as follows:

(a) *Except as authorized by this title, it shall be unlawful to*—

(1) knowingly open or maintain any place for the purpose of manufacturing, distributing, or using any controlled substance;

(2) manage or control any building, room, or enclosure, either as owner, lessee, agent, employee, or mortgagee, and knowingly and intentionally rent, lease, or make available for use, with or without compensation, the building, room, or enclosure for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance.

was proven, there could be conviction for it, although the evidence showed also another which was not alleged.").

### B. *Sufficiency of the Evidence*

■ To prove a violation of § 856(a)(1), the government had to demonstrate that Banks (1) knowingly (2) opened or maintained his home at 2075 Roosevelt (3) for the purpose of manufacturing, distributing, or using crack. *United States v. Church*, 970 F.2d 401, 405–06 (7th Cir.1992), certiorari denied, —— U.S. ——, 113 S.Ct. 1009, 122 L.Ed.2d 157 (1993). The testimony of Walter Shoulders reveals that Banks acted knowingly: he was present at sales, bought crack for himself, cooked crack in his kitchen, and sometimes helped with deliveries. There is also adequate evidence that Banks "maintained" his house for these uses. He owned the house, used his kitchen to assist the enterprise, obtained food for Shoulders, identified customers, and woke Shoulders when customers came. *United States v. Clavis*, 956 F.2d 1079, 1091 (11th Cir.), certiorari denied, —— U.S. ——, 112 S.Ct. 2979, 119 L.Ed.2d 597 (1992).

■ Whether Banks acted "for the purpose of manufacturing, distributing, or using crack," however, presents a closer question. The phrase "for the purpose of" appears in both subsection (a)(1) and (a)(2), but it has a different meaning in each. Under (a)(1) the "purpose" is that of the defendant; it is not enough to open or maintain a place that is used by others for proscribed purposes, the defendant must maintain the place for his own goal of manufacturing, distributing, or using drugs. *United States v. Chen*, 913 F.2d 183, 190 (5th Cir.1990) ("[T]he phrase *for the purpose of* [in subsection (a)(1)] applies to the person who opens or maintains the place for the illegal activity."). In (a)(2) the "purpose" may be that of others; the defendant is liable if he manages or controls a building that others use for an illicit purpose, and he either knows of the illegal activity or remains deliberately ignorant of it. *Id.*

According to Banks the government may have proven him guilty under (a)(2), but it did not prove that he had the necessary intent for an (a)(1) conviction. This raises the question of what it takes to prove that a defendant ran a house "for the purpose of" narcotics crimes under (a)(1). A recent decision of this Court sheds some light on that question. *United States v. Thomas*, 956 F.2d 165 (7th Cir.1992), involved a sentencing departure where the district court had analogized to § 856(a)(1). The Court found this analogy was improper where the defendant had merely been a guard for a drug house; at most he had aided and abetted a § 856 violation, and aiders and abettors should not be punished as severely as those who personally violate the statute. *Id.* at 167. As the opinion explained, "The drug-house statute is broadly worded but appears to be aimed, like the drug-kingpin statute, at persons who occupy a *supervisory, managerial, or entrepreneurial role* in a drug enterprise, or who knowingly allow such an enterprise to use their premises to conduct its affairs." *Id.* at 166 (emphasis added). Thus, *Thomas* suggests that one way to tell whether a defendant had the requisite mental purpose under (a)(1) is to decide whether he acted as a supervisor, manager, or entrepreneur.

Given this test, Banks could argue that he did not violate (a)(1) because J.R. and Nuke were the supervisors of this crack house and the entrepreneurs who started it rolling: they made most of the crack themselves, they made the deliveries each day, they instructed Shoulders and moved him from house to house, and they controlled all of the money. Banks, in contrast, did not handle the money or large quantities of crack. Indeed, the ultimate testament to his lack of authority in the house is that he couldn't get Shoulders to give him crack either for free or on credit; he had to pay cash like any other customer, hardly the sign of someone in power. Trial Tr. at 83–84. On the other hand though, he was more than a mere landlord. He sometimes cooked his friends' cocaine into crack for them, after which they would use it in his basement; he made occasional deliveries of crack to his friends; he identified customers and was present at sales; and he used

his ownership of the house to get crack for himself by instituting the "cover charge" for those who smoked there.

Thus Banks seems to fall somewhere between a typical supervisor, liable under (a)(1), and a simple landlord, liable only under (a)(2). Nevertheless, we think the evidence, when viewed in the light most favorable to the government, is sufficient to support the conviction. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). First and most important, the facts show that Banks both maintained the house and, while maintaining it, manufactured, distributed, and used drugs there. That confluence of activities—maintaining a crack house and using it to personally perform the acts proscribed by (a)(1)—could support an inference that he maintained the house "for the purpose of" violating that subsection. Second, *Thomas* held that treating a drughouse guard like a full-fledged (a)(1) offender was improper because the guard merely facilitated the crime. Banks, however, not only facilitated the crime with his actions, but also committed a separate offense by allowing his house to be used for illicit purposes. He was a step beyond a mere underling and a step beyond a mere landlord, and therefore could be viewed as playing a managerial or supervisory role in the operation. Finally, whether or not Banks was at the same level in the scheme as J.R. and Nuke, he still managed the use of the house by means of his "cover charge" for those who smoked crack there. Such management helps demonstrate that Banks maintained the house for the purpose of distributing and using drugs.

C. *Sentence Enhancement for Possession of a Firearm*

■ Banks' second claim raises a question regarding the meaning of "possessed"

in former guideline § 2D1.8(b)(1),[3] which provided for a two-point enhancement when "a firearm or other dangerous weapon was possessed." When police searched Banks' house they discovered a gun in the kitchen. It turned out that the gun belonged to one Loren Bryant, a tenant at the house, who was convicted of possessing the weapon under 18 U.S.C. § 924(d)(1). Bryant, it turns out, is actually Nuke, the man who helped operate the crack house.[4] Despite Nuke's conviction, the court adopted the PSI's recommendation to hold Banks equally responsible for possessing the gun, and therefore added two points to his offense level. Banks maintains that he cannot have "possessed" the gun because there was no evidence linking him to the gun or the gun to the crime.

■ A determination that a defendant possessed a weapon during an offense is a finding of fact, reviewed for clear error. *United States v. Armond*, 920 F.2d 480, 481 (7th Cir.1990). In cases involving guideline § 2D1.1(b)(1),[5] this Circuit holds that there is no need for proof of a nexus between the weapon and the crime; it is enough that it was possessed at the time of the offense. *United States v. Atterson*, 926 F.2d 649, 663 (7th Cir.1991). Banks, however, argues that in the context of drug-house prosecutions under § 856 some nexus between the defendant's possession of the weapon and the offense ought to be required. He believes this is necessary because otherwise defendants will be held accountable for any gun in the house, regardless of whether they ever used it or even knew of it. The Eighth Circuit applies such a standard under § 2D1.1, *United States v. Khang*, 904 F.2d 1219, 1223–24 (8th Cir.1990), and Banks urges this court to adopt the same test, at least in drughouse cases.

**3.** Section 2D1.8 was completely replaced as of November 1, 1992, which was after the sentencing in this case. *See* n. 1, *supra.*

**4.** Bryant also used the name Eddie Woods. Addendum to Presentence Report, p. 3; Trial Tr. 77, 97–98.

**5.** Although at the time of sentencing § 2D1.8(b)(1) provided the basis for the enhancement, the parties based their arguments

on cases interpreting § 2D1.1(b)(1), which provides for the same type of enhancement based on the possession of a weapon during a narcotics offense. Since that time § 2D1.8 has been amended, and in its new form it refers directly to § 2D1.1 as setting the offense level for a § 856 violation. Thus, the commentary to that guideline and the cases interpreting it are directly relevant to the enhancement at issue here.

The weight of authority opposes Banks' position. Several courts have held that when a house serves as the situs of an ongoing drug crime and guns are found within the house, those committing the crime may be held accountable for possessing the guns. *See United States v. Pellegrini*, 929 F.2d 55, 56 (2d Cir.1991) (enhancement proper for gun present in house where drugs were stored and deals were arranged); *United States v. Duncan*, 918 F.2d 647, 651 (6th Cir.1990) ("The cases are all consistent in that they recognize that enhancement is appropriate if a weapon is found in the residence where the drug transaction occurs"); *United States v. McKeever*, 906 F.2d 129, 134 (5th Cir.1990) (where entire house used to process drugs, it was logical to infer that eight firearms were there to protect unlawful activity); *United States v. Wayne*, 903 F.2d 1188, 1198 (8th Cir.1990) (enhancement upheld for guns found in home from which defendant conducted narcotics activities); *United States v. Franklin*, 896 F.2d 1063, 1065–66 (7th Cir.1990) ("mere presence" of handguns at home, which was base of drug activity, was enough to justify enhancement). *But see United States v. Apple*, 915 F.2d 899, 914–15 (4th Cir.1990) ("[T]he [Sentencing] Commission did not intend that the mere fact that a weapon was found in the home of the defendant is necessarily sufficient for enhancement under [§ 2D1.1(b)(1) ].").

A defendant can avoid this enhancement only by showing that "it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, application note 3. That is certainly not the case here, where the gun was found in the kitchen that Banks and others used to cook crack. It is widely acknowledged that guns are "tools of the trade" in the drug business, *Armond*, 920 F.2d at 482–83, and the district court could certainly find that a gun recovered from a room used to manufacture drugs was possessed during the offense, and that the owner of the house shared in that possession. *Cf. United States v. Ewing*, 979 F.2d 1234, 1238 (7th Cir.1992) ("The seizure of a firearm in close proximity to illegal drugs is considered powerful support for the inference that the firearm was used in connection with the drug trafficking operation.").

Furthermore, Banks may be held accountable for the gun because it was reasonably foreseeable that Nuke, a co-participant in a joint criminal venture, would possess it. Under U.S.S.G. § 1B1.3, application note 1, a defendant may be held accountable for "criminal activity undertaken in concert with others, whether or not charged as a conspiracy, ... includ[ing] conduct of others in furtherance of the execution of a jointly-undertaken criminal activity that was reasonably foreseeable to the defendant."[6] Courts have applied this section in many cases involving the distribution or sale of narcotics. *See United States v. Ortega–Mena*, 949 F.2d 156, 160 (5th Cir.1991) (drug smuggler stowed away in ship's hold near drugs and bullets could foresee presence of guns); *United States v. Bianco*, 922 F.2d 910, 912 (1st Cir.1991) (guns foreseeable where defendant knew transaction would involve sizeable amounts of drugs and cash); *United States v. Aguilera–Zapata*, 901 F.2d 1209, 1215–16 (5th Cir.1990) (gun foreseeable at large drug transaction); *United States v. White*, 875 F.2d 427, 433 (4th Cir.1989) (same). Nuke participated in every phase of running the crack house, which sold significant amounts of crack each day. Since guns are tools of the drug trade, it was reasonably foreseeable that he would possess one during the offense.

For the reasons stated, Banks' conviction and sentence are

AFFIRMED.

---

**6.** Section 1B1.3 was amended as of November 1, 1992, but the law is still the same. Application note 2 now provides that "The conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision." We also note that a presumption that something was reasonably foreseeable may be rebutted by the defendant. *United States v. Bianco*, 922 F.2d 910, 912 (1st Cir.1991).