BAUER, Circuit Judge.
Lawrence E. Void was convicted by a jury of conspiracy to manufacture methcathinone, a Schedule I controlled substance. 21 U.S.C. §§ 841(a)(1), 846; 21 C.F.R. § 1308.11(f)(4). Joel R. Cox pleaded guilty to the same offense. Void and Cox appeal their sentences. Cox challenges the quantity of methcathi-none attributed to him by the district court in determining his base offense level under the Sentencing Guidelines. Void challenges the district court’s two-level enhancement in his offense level for possession of a firearm pursuant to Guideline § 2Dl.l(b)(l). We affirm Cox’s sentence but vacate Void’s sentence and remand for resentencing.
I.
Cox learned how to make methcathinone[1] in the winter of 1991-1992 from William An-geloff and Frances Pascenti, two residents of Michigan’s Upper Peninsula. Cox met James Dean, a methcathinone addict, in the fall of 1992 in Iron River, Michigan, in the Upper Peninsula. Cox and Dean soon formed a partnership for making and distributing methcathinone. Dean assisted Cox in manufacturing methcathinone in Cox’s trailer in Long Lake, Wisconsin. Dean claimed in an interview with Wisconsin police officers to have manufactured methcathinone with Cox at least thirty to forty times between November 1992 and June 1993. According to Dean, each manufacture, or “cook,” produced a minimum of five to six ounces of methcathi-none. Dean also claimed that Cox had several loaded firearms available during each “cook.” Dean knew that Cox possessed several rifles, shotguns, and handguns at his residence, including a .38 caliber derringer which Cox always carried with him.
Lauren Goss, Cox’s girlfriend, moved into Cox’s trailer in January or February 1993. Goss, an exotic dancer and a methcathinone addict, objected to the smell produced during the “cooks” and forced Cox to stop making methcathinone in the trailer. Cox and Dean ended their partnership in February or March 1993. Cox made methcathinone with John Sebero on two occasions in the late winter or early spring of 1993 in Cox’s trailer and in Goss’s absence. Void was present during the second “cook.”
Cox and Void formed a partnership for making methcathinone in the summer of 1993. Void’s wife, Beverly, supplied them with ephedrme pills, an ingredient of meth-cathinone. Cox and Void made methcathi-none together at least four times during the summer of 1993. The first two “cooks” occurred in a shed behind Void’s residence in Eagle River, Wisconsin, and in Void’s kitchen. Eagle River is approximately thirty miles from Long Lake. Two other “cooks” occurred in the garage of Richard Peters, a friend of Void’s, in Eagle River. Goss was present during all four “cooks.”
Goss was interviewed by Wisconsin police officers on November 4, 1993. Goss told the officers that Cox and Dean manufactured methcathinone two times after she moved into Cox’s trailer. Goss said that Cox told her that Cox and Dean made methcathinone twelve times before she moved in. Cox sold methcathinone for $1,000 an ounce and told Goss that his yield from each “cook” with Dean was between $5,000 and $6,000. Goss also said that “Cox always carries a Derringer [sic] handgun with him,” and Cox had told her that “he would rather shoot it out with police than be arrested.”
Cox was questioned by Wisconsin police officers on November 11,1993, outside Void’s residence in Eagle River. Cox was not carrying a derringer. The officers recovered a *918 loaded .38 caliber derringer from Cox’s trailer in Long Lake later that day.
Cox and Void were charged in a one-count indictment with conspiracy to manufacture metheathinone. 21 U.S.C. §§ 841(a)(1), 846; 21 C.F.R. § 1308.11(f)(4). The indictment alleged that the conspiracy occurred “from on or about May 1, 1993, until on or about September 1, 1993.” Cox pleaded guilty. Void pleaded not guilty and was convicted by a jury after a one-day trial.
The Probation Office in Cox’s presentence investigation report (“PSR”) recommended that the quantity of metheathinone attributed to Cox for purposes of calculating his base offense level include 150 ounces which Cox manufactured with Dean between November 1992 and February 1993. This quantity was based on Dean’s statement that Dean and Cox engaged in at least thirty “cooks” and that each “cook” produced at least five ounces of metheathinone. The government and Cox objected to this recommendation. The government suggested that the district court find that Cox and Dean had engaged in fourteen “cooks” which each produced four ounces of metheathinone. Cox asserted that he had engaged in only ten “cooks” with Dean, and each “cook” produced three to four ounces of metheathinone. The district court found that Cox had engaged in fourteen “cooks” with Dean and that each “cook” produced five ounces of metheathinone. The district court therefore concluded that Cox’s relevant conduct included seventy ounces of metheathinone which Cox manufactured with Dean. The district court sentenced Cox to 122 months’ imprisonment followed by five years of supervised release.
Void’s PSR recommended that Void receive a two-level enhancement in his offense level for possession of a firearm under Guideline § 2Dl.l(b)(l). Void objected to this recommendation. The district court overruled Void’s objection and imposed the enhancement. The district court sentenced Void to 110 months’ imprisonment followed by five years of supervised release.
II.
Cox challenges the district court’s finding that his relevant conduct included seventy ounces of metheathinone which Cox manufactured with Dean. The district court’s determination of the quantity of metheathinone involved in Cox’s offense is a finding of fact which we review for clear error. United States v. Ferguson, 35 F.3d 327, 332-33 (7th Cir.1994), cert. denied, — U.S. —, 115 S.Ct. 1832, 131 L.Ed.2d 752 (1995); United States v. Montgomery, 14 F.3d 1189, 1196 (7th Cir.1994). The government bears the burden of establishing the quantity of metheathinone involved in Cox’s offense by a preponderance of the evidence. United States v. Beler, 20 F.3d 1428, 1431 (7th Cir.1994).
In determining a defendant’s base offense level under the Guidelines, the district court must consider “all acts and omissions ... that were part of the same course of conduct or common scheme or plan as the offense of conviction.” United States Sentencing Commission, Guidelines Manual, § 1B1.3(a)(2) (Nov. 1994). “ ‘The defendant need not have been either charged with or convicted of carrying out these other acts.’” Beler, 20 F.3d at 1431 (quoting United States v. Thomas, 969 F.2d 352, 355 (7th Cir.1992), cert. denied, — U.S. —, 113 S.Ct. 274, 121 L.Ed.2d 202 (1992)). The acts may also be outside the period of the conspiracy. Ferguson, 35 F.3d at 334.
A criminal defendant “ ‘has a due process right to be sentenced on the basis of reliable information.’ ” Beler, 20 F.3d at 1432 (quoting United States v. Campbell, 985 F.2d 341, 348 (7th Cir.1993)). Guideline § 6A1.3(a) provides that the district court “may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.” In Beler, we held that the reliability standard of Guideline § 6A1.3(a) “must be rigorously applied” and “[u]nreliable allegations must not be considered.” Id. at 1433.
The evidence upon which the district court relied in finding that Cox manufactured seventy ounces of metheathinone with Dean is twofold. First, Dean told Wisconsin police officers that he and Cox made metheathinone at least thirty to forty times between November 1992 and June 1993 in Cox’s trailer, and each “cook” produced at least five to six ounces of metheathinone. Second, Goss stated in her interview that Cox told her that Cox and Dean made metheathinone together twelve times before she moved into Cox’s *919 trailer. Goss observed Cox and Dean manufacture metheathinone two times after she moved in. Cox also told Goss that his yield from each “cook” with Dean was between $5,000 and $6,000, and Goss knew that Cox sold metheathinone for $1,000 an ounce.
The government asserted that Dean’s statement should be discounted under Beler. Dean was a metheathinone addict who had a lengthy criminal history. The amount of metheathinone estimated by Dean would have required approximately 360,000 ephedrine pills to produce, and the government had no evidence that either Cox or Dean had received this many pills. Dean told the officers that his partnership with Cox lasted from November 1992 until June 1993. The government had strong evidence that the partnership ended at least three months earlier. Cox’s PSR simply compressed Dean’s total estimate into a smaller time frame. Under the PSR’s estimate, Cox and Dean would have manufactured metheathinone twice a week every week for approximately fifteen weeks. This estimate conflicted with a statement by Dean to the officers that he and Cox only sometimes manufactured meth-eathinone twice a week.
The district court agreed with the government and accepted Dean’s estimate only to the extent that it was corroborated by Goss. According to Goss’s statement, Cox and Dean had engaged in fourteen “cooks.” The district court observed Goss testify against Void and stated that it found her to be “believable, credible, [and] reliable.” Cox Sentencing Hr’g Tr. at 15. The district court found that each “cook” produced five ounces of metheathinone because this quantity was supported by the statements of both Dean and Goss.
Cox concedes that his metheathinone “cooks” with Dean were relevant conduct under Guideline § 1B1.3(a)(2). Cox, however, asserts that his sentence must be vacated because the evidence which supports the district court’s finding is unreliable under Be-ler. [2] Cox contends that the district court ignored Beler’s command that the information provided by Dean and Goss be subject to special scrutiny in light of the dual status of Dean and Goss as metheathinone addicts and government informants. See Beler, 20 F.3d at 1435. We do not agree.
The district court did exactly what was required of it under Beler. The district court was aware of its obligation under Beler to apply searching scrutiny to the statements of Dean and Goss. The district court did not accept Dean’s statement at face value but instead discounted his estimate of metheathi-none production for the reasons stated above. The district court believed Goss’s statement for several reasons. Goss was Cox’s girlfriend and lived with Cox in his trailer. She observed two of the “cooks” herself. Her statement was corroborated by Dean. The district court observed Goss testify against Void and found her to be credible. The only evidence which conflicted with Goss’s statement was Cox’s self-serving assertion that he had engaged in only ten “cooks” with Dean which each produced three to four ounces of metheathinone. The district court did not clearly err in concluding that Goss’s statement satisfied the heightened scrutiny required by Beler.
Cox asserts that the statements of Dean and Goss were inherently unreliable under Beler because Dean and Goss were meth-eathinone addicts and government informants. Beler did not hold that the testimony of an addict-informant is inherently unreliable; we stated that the addict-informant in Beler could provide drug quantity information on remand. Id. Beler merely required that such testimony be subject to special scrutiny, which the district court applied to the statements of Dean and Goss. See id.
*920 The district court’s reliance on Goss’s statement did not deprive Cox of his due process right to be sentenced on the basis of reliable information. And “ ‘[t]he testimony of one witness, even one arguably biased against the defendant, is sufficient to support a finding of fact.’ ” United States v. Rivera, 6 F.3d 431, 445 (7th Cir.1993) (quoting United States v. Cedano-Rojas, 999 F.2d 1175, 1180 (7th Cir.1993)), cert. denied, — U.S. —, 114 S.Ct. 1098, 127 L.Ed.2d 411 (1994). The district court’s finding that Cox manufactured seventy ounces of methcathinone with Dean is not clearly erroneous.
III.
Void contends that the district court erred by imposing a two-level enhancement in his offense level for possession of a firearm pursuant to Guideline § 2D1.1(b)(1). We review the district court’s factual findings supporting the enhancement for clear error. United States v. Anderson, 61 F.3d 1290, 1303 (7th Cir.1995); United States v. Jones, 54 F.3d 1285, 1294 (7th Cir.1995). The government must establish the appropriateness of the enhancement by a preponderance of the evidence. United States v. Mumford, 25 F.3d 461, 465 (7th Cir.1994).
Guideline § 2D1.1(b)(1) establishes a two-level enhancement “[i]f a dangerous weapon (including a firearm) was possessed.” Application Note Three to the Guideline states that “[t]he adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.” In determining whether to enhance Void’s offense level for possession of a firearm, the district court was required to consider “all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity” that occurred during, in preparation for, or while attempting to avoid detection or responsibility for, the offense of conviction. U.S.S.G. § 1B1.3(a)(1)(B).
We have held that “the enhancement for weapons possession is applicable where the defendant is accountable for the possession of a weapon by a co-conspirator during drug trafficking conduct relevant to the offense of conviction_” Mumford, 25 F.3d at 468; see also Anderson, 61 F.3d at 1304 n. 14. A defendant’s offense level may be enhanced under Guideline § 2D1.1(b)(1) if (1) a co-conspirator possessed a firearm during acts in furtherance of the conspiracy; and (2) the co-conspirator’s possession of the firearm was reasonably foreseeable to the defendant. United States v. Johnson, 997 F.2d 248, 257 (7th Cir.1993); United States v. Morgan, 942 F.2d 243, 246-47 (4th Cir.1991); United States v. Bianco, 922 F.2d 910, 912 (1st Cir. 1991) (collecting cases).
The district court found that Cox possessed a .38 caliber derringer “at all times during the manufacturing process” with Void. Void Sentencing Hr’g Tr. at 18. The district court relied solely on Goss’s statement that “Cox always carries a Derringer [sic] handgun with him” and that Cox had told her that “he would rather shoot it out with police than be arrested.” The district court found that Cox’s possession was reasonably foreseeable to Void “based upon the use of the weapon and the knowledge that weapons are used in this type of criminal activity.” Id. at 19. Both findings are clearly erroneous.[3]
Goss’s statement was made on November 4, 1993, approximately two months after the conspiracy between Void and Cox ended. Although Goss was present with Cox and Void during all four “cooks” in Eagle River, she did not state that Cox possessed the derringer during any of these “cooks.” The government presented no other evidence that Cox possessed a firearm during the “cooks” in Eagle River. The district court simply assumed from Goss’s statement that Cox conducted himself in the same manner dur *921 ing every “cook.” This assumption was unwarranted. Sebero told the government that, although Cox possessed a firearm during a prior “cook,” Sebero did not see any firearms while Sebero, Cox, and Void manufactured methcathinone in Cox’s trailer in the late winter or early spring of 1993. And Cox was not carrying a derringer when he was questioned by the officers on November 11, 1998, outside Void’s residence. Goss’s statement, without more, does not establish that Cox possessed the derringer during the conspiracy.
The government asserts that the district court’s finding is not clearly erroneous because Goss’s statement was corroborated by Dean’s statement that Cox had several loaded firearms available during each “cook” in Cox’s trailer, including a .38 caliber derringer which Cox always carried with him. This argument is problematic on several grounds. First, the district court did not rely on Dean’s statement in imposing the enhancement. Second, Dean’s credibility was questionable for the same reasons his estimate of methcathinone production was discounted under Beler. Third, Dean manufactured meth-cathinone with Cox at a different time and in a different location. Dean and Cox manufactured between November 1992 and February 1993 in Cox’s trailer. Void and Cox manufactured in the summer of 1993 in Eagle River, which was approximately thirty miles from Cox’s trailer in Long Lake. Dean’s statement has no bearing on whether Cox possessed a derringer during his conspiracy with Void.
Even if Goss’s statement was sufficient to establish Cox’s possession of a derringer during the conspiracy, the government failed to prove that Cox’s possession was reasonably foreseeable to Void. The government presented no evidence that Cox fired or brandished the derringer in Void’s presence, or that the derringer was anything but concealed while Cox and Void were together. The district court’s reliance on Cox’s “use of the weapon” in imposing the enhancement was therefore erroneous. The government also presented no evidence that Cox told anyone other than Goss that “he would rather shoot it out with police than be arrested,” and there was no evidence that Void was present when Cox said this.
 The government contends that the risk of manufacturing methcathinone establishes the reasonable foreseeability of a concealed firearm to Void. We have often recognized that firearms and drug trafficking go hand in hand. E.g., Mumford, 25 F.3d at 469; United States v. Banks, 987 F.2d 463, 468 (7th Cir.1993); United States v. Diaz, 864 F.2d 544, 549 (7th Cir.1988), cert. denied, 490 U.S. 1070, 109 S.Ct. 2075, 104 L.Ed.2d 639 (1989). We have never held, however, that the mere risk involved in a drug manufacturing conspiracy establishes the reasonable foreseeability of a concealed firearm under Guideline § 2D1.1(b)(1) absent other evidence. The government’s position would establish strict liability for possession of a firearm under the Guideline for every drug manufacturing conspirator if any one co-conspirator possessed a concealed firearm during the conspiracy. This result vitiates the government’s burden of proof at sentencing as well as the district court’s obligation under the Guidelines to conduct an individualized inquiry to ensure “that the defendant is sentenced only on the basis of a conspiracy that was reasonably foreseeable to him.” United States v. Edwards, 945 F.2d 1387, 1399 (7th Cir.1991), cert. denied, 503 U.S. 973, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992). The government’s position is even more untenable where, as here, the evidence that a co-conspirator possessed a firearm during the conspiracy is extremely weak. We therefore reject it. The district court’s enhancement in Void’s offense level for possession of a firearm under Guideline § 2D1.1(b)(1) is clearly erroneous.
For the foregoing reasons, Cox’s sentence is affirmed. Void’s sentence is vacated, and the case is remanded for resentencing.
AFFIRMED IN PART, VACATED IN PART, AND Remanded.

. Methcathinone became a Schedule I controlled substance on May 1, 1992. Methcathinone is distributed in powdered form, has a chemical structure similar to that of methamphetamine, and produces similar responses. 57 Fed.Reg. 18,824 (1992).

. The government asserts that the district court was entitled to rely on Cox's PSR because Cox offered no more than a bare denial of the facts contained therein. See United States v. Mustread, 42 F.3d 1097, 1102 (7th Cir. 1994) ("A defendant cannot show that a PSR is inaccurate by simply denying the PSR's truth.”). This argument is without merit. Cox did more than simply deny the accuracy of the PSR; he stated that he had engaged in only ten “cooks” with Dean which each produced three to four ounces of metheathi-none. Cox therefore met his burden of producing evidence questioning the accuracy of the PSR, and the government was required to convince the district court that the PSR was accurate. See id.

. The government contends that the district court was entitled to rely on Void’s PSR because Void only denied the facts in the PSR. See supra note 2. At sentencing, Void did not deny that Goss made the statement to the police; he asserted that Goss's statement did not support an enhancement under Guideline § 2D1.1(b)(1). Vold's assertion was sufficient to suggest inaccuracy because the PSR contained “nothing but a ‘naked or unsupported charge.' " Mustread, 42 F.3d at 1102 (citations omitted). The government was required to show that Goss's statement supported the enhancement. See id.