In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-3529

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

EDWIN SANCHEZ,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10-CR-131—**Charles R. Norgle**, *Judge.*

ARGUED SEPTEMBER 25, 2012—DECIDED MARCH 6, 2013

Before KANNE, TINDER, and HAMILTON, *Circuit Judges*.

KANNE, *Circuit Judge*. After pleading guilty to partic-
ipating in a conspiracy to distribute cocaine, Edwin
Sanchez was sentenced to 262 months of incarceration
and five years of supervised release. His punishment
took into account a new sentencing enhancement for a
defendant who "maintained a premises for the pur-
pose of manufacturing or distributing a controlled sub-
stance." U.S.S.G. § 2D1.1(b)(12). Sanchez now appeals
his sentence. He contends that applying the enhance-

ment to him violated the *ex post facto* clause of the Constitu-
tion or was otherwise an incorrect application of the
law. He also challenges his sentence on various pro-
cedural and substantive grounds. We do not find any
error, however, and therefore affirm Sanchez's sentence.

## I. BACKGROUND

In mid-2007, Edwin Sanchez began participating in a
large drug conspiracy. He linked up with Carlos Gascar-
Corona, a drug distributor with ties to the Mexican drug
cartel La Familia Michoacana. Gascar-Corona would
provide Sanchez with cocaine at no cost but under the
proviso that Sanchez would turn over the money after
the drugs sold. Given this arrangement, Gascar-Corona
needed confidence in Sanchez. So, he initially provided
Sanchez with two or three kilograms of cocaine at a
time. Once Sanchez proved he could sell that quantity,
the size of the shipments increased. Gascar-Corona
started giving Sanchez twenty to thirty kilograms at
a time. Sometimes, he provided as much as forty kilo-
grams. Sanchez sold cocaine for Gascar-Corona until
June or July 2009. During that approximately two-year
period, Gascar-Corona sold nearly $2.5 million worth
of drugs, and Sanchez was his largest wholesaler.

Throughout this time, Sanchez lived in a rented
home with his girlfriend, their two children, his aunt,
his grandmother, and his grandmother's boyfriend.
Notably, Sanchez used this residence in furtherance of the
conspiracy. Gascar-Corona would sometimes meet other
wholesalers at Sanchez's home in order to distribute

drugs to those individuals. More importantly, as the Presentence Investigation Report ("PSR") stated, Sanchez "would receive the supply of drugs directly at his garage and payment would be picked up from the garage at a later date." (PSR at 4.) He would also "hide the drugs in the attic in order to keep . . . [other people] . . . from discovering what he was doing." (Def.'s Version of the Offense at 3.) Sanchez, however, "kept narcotics there only as long as he had to, quickly transferring them from the premises." (*Id.*)

By August 2009, the Drug Enforcement Agency had caught on. They arrested Sanchez, but his girlfriend's father posted bail a month later. Gascar-Corona was also arrested. While waiting for the government to bring charges, both Sanchez and Gascar-Corona became informants. Sanchez wore a wire and provided other information, but his tips did not lead to any new arrests, nor did they materially advance existing investigations. Gascar-Corona's information, in contrast, led to the arrest of a high-ranking drug-dealer in Mexico, whom the Mexican government later agreed to extradite to the United States.

In April 2010, a grand jury indicted Sanchez for conspiring to possess, with intent to distribute, more than five kilograms of a cocaine mixture, in violation of 21 U.S.C. §§ 841 and 846. Sanchez pled guilty on April 12, 2011. He did not sign a written plea agreement.

The PSR recommended a total offense level of thirty-seven. This recommendation included a two-point increase for a defendant who "maintained a premises for

the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12). Sanchez objected to this enhancement for two reasons. First, he claimed that applying the enhancement to him violated the *ex post facto* clause of the U.S. Constitution. He based that argument on the fact that the enhancement did not become effective until November 1, 2010, over a year after he committed his offense. *See* U.S.S.G. § 2D1.1(b)(12) & app. C. amend. 748 (Nov. 1, 2010). Second, Sanchez argued that the enhancement, as written, did not apply to him. He claimed that he did not maintain the premises, and, even if he did, he did not do so for the purpose of selling drugs. The district court overruled the objection on both grounds, adopted the PSR's factual findings, and applied the sentencing enhancement to Sanchez.

At Sanchez's sentencing hearing, defense counsel discussed various factors that militated in favor of a mitigated sentence. Relevant here, counsel brought to the court's attention the sentencing of Gascar-Corona. The district court had not yet sentenced Gascar-Corona, but the government had recommended a lesser punishment than it had for Sanchez, in exchange for Gascar-Corona's helpful information. Sanchez argued that this disparity could not stand. Specifically, he claimed that he tried to cooperate just as much as Gascar-Corona, but, because Gascar-Corona was more deeply enmeshed in the drug business, he had more useful information to offer. Sanchez argued that it did not make sense to reward Gascar-Corona for being the more culpable party. The district court said that it was too speculative to consider Gascar-Corona's sentence at that time, and it

thus could not use the information in determining Sanchez's punishment. The district court also noted that "the Seventh Circuit does not look with approval on sentencing in terms of comparison between co-defendants, to make it all come out . . . symmetrical." (Sent. Tr. at 20.)

On October 25, 2011, the district court sentenced Sanchez to 262 months of incarceration, followed by five years of supervised release. This sentence represented the minimum penalty recommended by the Sentencing Guidelines. As of this writing, Gascar-Corona has yet to be sentenced, although his plea agreement recommends a sentence of 126 months. Sanchez timely filed a notice of appeal regarding his sentence on November 8, 2011.

## II. ANALYSIS

Sanchez presents four issues on appeal. First, he renews his objection that the sentencing enhancement found in U.S.S.G. § 2D1.1(b)(12), as applied to him, violates the *ex post facto* clause. Second, he also renews his claim that the enhancement, even if it could be constitutionally applied to him, simply does not apply, given the facts of his case. Third, Sanchez argues that the district court committed a procedural error by not considering the disparity with Gascar-Corona's potential sentence. Finally, he argues that the court committed a substantive error by imposing an unreasonable sentence in light of Sanchez's cooperation with the government. We address each of these arguments in turn.

*A. Ex Post Facto Clause*

The Constitution prohibits *ex post facto* laws. U.S. Const. art. I, § 9, cl. 3. Sanchez claims that, when applied to him, the new sentencing enhancement found in § 2D1.1(b)(12) violates that prohibition. The sequence of events is critical to understanding this claim. Sanchez stopped distributing cocaine in June or July 2009, but he did not plead guilty until April 2011. In the intervening time, as part of the Fair Sentencing Act of 2010, Congress mandated that the Sentencing Commission promulgate the enhancement at issue. P.L. 111-220 § 6(2), 124 Stat. 2372, 2373. The Sentencing Commission did so, and the enhancement became effective on November 1, 2010. *See* U.S.S.G. § 2D1.1(b)(12) & app. C. amend. 748 (Nov. 1, 2010). Because the enhancement did not take effect until after Sanchez committed his offense, he thus contends that the district court could not apply it to him without violating the *ex post facto* clause. This claim presents a constitutional question, which we review *de novo. Anderson v. Milwaukee County*, 433 F.3d 975, 978 (7th Cir. 2006).

We can make short work of Sanchez's argument. In *United States v. Demaree*, we held that amendments to advisory sentencing guidelines do not implicate the *ex post facto* clause, even if the amendments were passed after the defendant committed the offense. 459 F.3d 791, 795 (7th Cir. 2006). Sanchez spent a significant portion of his brief discussing how other circuits have reached a different conclusion, but, as we have said before, we "respectfully disagree" with our sister circuits

on this issue. *United States v. Robertson*, 662 F.3d 871, 876 (7th Cir. 2011). For that reason, we have consistently rejected Sanchez's familiar argument. *See, e.g.*, *United States v. Wasson*, 679 F.3d 938, 951 (7th Cir. 2012); *United States v. Conrad*, 673 F.3d 728, 736-37 (7th Cir. 2012); *Robertson*, 662 F.3d at 876 (collecting cases).[1]

Sanchez's attempts to distinguish *Demaree* also prove unavailing. First, Sanchez argues that we should treat § 2D1.1(b)(12) differently because Congress wrote it and mandated its inclusion in the Guidelines, rather than using the standard method of delegating that duty to the Sentencing Commission. This argument misses the point of *Demaree*. The fact that Congress wrote the enhancement does not alter the fact that it is still part of advisory guidelines, which, under *Demaree,* do not implicate the *ex post facto* clause. 459 F.3d at 795. Sanchez's argument would have force if Congress enacted a statutorily-required minimum punishment for maintaining a drug house, but that is not the case.

Second, Sanchez attempts to distinguish *Demaree* by arguing that, unlike the defendant in that case, he was "blindsided by a change in the law," which thus implicates the "core concern of the *ex post facto* prohibition." (Appellant's Br. at 16.) Sanchez's counsel explained at oral argument that the enhancement "made something

---

[1] We do note, however, that the U.S. Supreme Court has granted a writ of certiorari in one of our cases reiterating the holding of *Demaree. United States v. Peugh*, 675 F.3d 736 (7th Cir. 2012), *cert. granted*, 133 S. Ct. 594 (Nov. 9, 2012).

illegal that was not illegal at the time of the offense." We cannot see the logic in this argument. It is not as if the enhancement suddenly made selling drugs in one's home illegal. Sanchez's cocaine sales were clearly illegal from the beginning, and he knew that he could be punished for them, regardless of where the transactions occurred. Thus, the enhancement merely increased the advised punishment for already illegal conduct, which does not implicate the *ex post facto* clause. *See Demaree*, 459 F.3d at 795.

## B. *Sentencing Enhancement*

Sanchez next argues that the facts of his case do not satisfy the requirements of the sentencing enhancement found in § 2D1.1(b)(12). To review, the enhancement applies when the defendant "maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12). In the district court, Sanchez made two arguments. First, he contended that he did not "maintain" the residence because he did not have an ownership interest in it. Sanchez, however, has abandoned this argument on appeal and thus waives it. *See Int'l Union of Operating Eng'rs, Local 150 v. Rabine*, 161 F.3d 427, 432 (7th Cir. 1998). In this court, Sanchez only pursues his second argument—that he primarily used the home as a residence for his family, not for "manufacturing or distributing

a controlled substance."[2] U.S.S.G. § 2D1.1(b)(12). As we consider this claim, we review the district court's factual findings for clear error but review *de novo* its application of those findings to the Sentencing Guidelines. *United States v. Eubanks*, 593 F.3d 645, 649 (7th Cir. 2010).

We begin by examining the district court's findings of fact, which we will set aside only if we have a "definite and firm conviction that a mistake has been made." *United States v. McCauley*, 659 F.3d 645, 649 (7th Cir. 2011). We lack such a conviction here. In deciding that the enhancement applied to Sanchez, the district court adopted the factual findings of the PSR. (Sent. Tr. at 4.) Specifically, the PSR stated that Sanchez "would receive the supply of drugs directly at his garage and payment would be picked up from the garage at a later date." (PSR at 4.) At the sentencing hearing, Sanchez's counsel did not object to this information. (Sent. Tr. at 3.) Rather, counsel implicitly confirmed it by stating, "whatever storage of drugs took place there really wasn't in the residence [it was in the garage or attic], and would be there for a very brief time, almost immediately trans-

---

[2] Sanchez's opening brief stated in passing that he "maintained" the home as a residence but only "use[d]" it for drug transactions, which, according to him, does not qualify for the enhancement. (Appellant's Br. at 24); *see also* U.S.S.G. § 2D1.1(b)(12). Because Sanchez concedes that he maintained the premises in some fashion, we read this argument as geared only toward whether he maintained them *for the purpose* of his drug transactions.

ferred to buyers." (*Id.* at 4.) Given that Sanchez did not argue that the information in the PSR was false, and, indeed, further buttressed its account of the events, we cannot say that the district court clearly erred in adopting the PSR's factual findings.

Since we affirm the decision to adopt the factual statements in the PSR, we now review *de novo* whether those facts satisfy the legal standard set out in § 2D1.1(b)(12). *See Eubanks*, 593 F.3d at 649. We first turn to the application note that accompanies the enhancement:

> Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

U.S.S.G. § 2D1.1(b)(12), cmt. n.17.[3] Given the above, the enhancement clearly contemplates that premises can

---

[3] When this case was briefed and argued, this application note was number 28. Since then, the application notes have been renumbered, and the note became number 17. *See* U.S.S.G. § 2D1.1(b)(12) & app. C. amend. 770 (Nov. 1, 2012). There was no change in the language of the note itself.

have more than one principal use. We can thus dispose of the argument that, because Sanchez primarily used the home for raising a family, he could not have also primarily used it for selling drugs. Rather, the proper inquiry is whether the drug transactions were a second primary use of the premises or were instead merely a collateral use.

At the time of oral argument for this appeal, no appellate court had published a decision substantively interpreting § 2D1.1(b)(12). Unpublished cases and district court opinions presented only much clearer cases. *See United States v. Sandoval-Chavez*, 477 Fed. Appx. 154, 156 (5th Cir. 2012) (enhancement applied when defendant did not live in the premises used for the transactions); *United States v. Morales-Ortuno*, 879 F. Supp. 2d 608, 610 (E.D. Tex. 2012) (enhancement did not apply when defendant had leased premises for less than a week prior to arrest and had not participated in any drug transactions during that time); *United States v. Ortiz*, 807 F. Supp. 2d 746, 749 (N.D. Ill. 2011) (enhancement did not apply when defendant did not live in the premises and had only used them one time for a drug transaction).

After oral argument, however, the Eighth Circuit released an opinion much closer to this case. In *United States v. Miller*, Rebecca Miller was convicted of conspiracy to distribute a methamphetamine mixture. 698 F.3d 699, 702 (8th Cir. 2012). The primary offender was Miller's husband, who used the family home to distribute as much as two kilograms of methamphetamine per week over a six-year period. *Id.* Miller,

however, also participated. "[O]n several occasions she and her 17-year-old son assisted in the distribution . . ., including three occasions when she received money" from an informant-purchaser. *Id.* Miller's sentence included the enhancement found in § 2D1.1(b)(12), but she contended it did not apply because she primarily used the premises as a family home. *Id.* at 705-06. The Eighth Circuit disagreed. *Id.* at 706-07. The court found that Miller's participation in three purchases made her use of the premises for drug sales more than collateral. *Id.* The court also considered the "substantial" amount of drug trafficking that occurred out of Miller's home. *Id.* at 707.

We find the Eighth Circuit's reasoning informative. Like that court, we believe the application note's call to compare the frequency of illegal and legal activities at premises leads to odd results when the premises also serve as a primary residence. *See id.*; *see also* U.S.S.G. § 2D1.1(b)(12), cmt. n.17. In such cases, the family home is "by definition . . . used for that lawful purpose 100% of the time." *Miller*, 698 F.3d at 707. Yet, if that statistic alone prevented the enhancement from applying, it would never apply when residences are involved and would undermine the note's guidance that premises can have more than one principal use.

For that reason, the Eighth Circuit, after taking frequency into account, also considered other factors. *See id.* at 706-07. This approach conforms with the application note, which instructs courts to consider frequency but does not foreclose examining other indicia. *See*

U.S.S.G. § 2D1.1(b)(12), cmt. n.17. In determining what else to consider, the Eighth Circuit turned to the case law surrounding 21 U.S.C. § 856(a)(1), which makes it a crime to "knowingly open, lease, rent, use, or maintain any place . . ., for the purpose of manufacturing, distributing, or using any controlled substance." This language largely tracks that of U.S.S.G. § 2D1.1(b)(12). In fact, Sanchez encouraged us to compare the new enhancement with § 856, (Appellant's Br. at 23-24), and the government agreed during oral argument.

Before considering the § 856 case law, however, we must take into account the relevant difference in language.[4] The application note of § 2D1.1(b)(12) requires that the prohibited uses be "one of the defendant's primary or principal uses for the premises." U.S.S.G. § 2D1.1(b)(12), cmt. n.17. In contrast, the phrase in § 856 is more general; it merely requires that such use be "the purpose" for maintaining the premises. 21 U.S.C. § 856(a)(1). Our case law holds that, under § 856, the illicit use need not be the sole purpose. *United States*

---

[4] The specific language that Sanchez drew our attention to is actually irrelevant to his case. He sought to highlight the narrower scope of the sentencing enhancement; it only applies when a defendant "maintained" the premises, U.S.S.G. § 2D1.1(b)(12), whereas 21 U.S.C. § 856(a)(1) applies when the defendant "open[ed], lease[ed], rent[ed], use[d], or maintain[ed]" the premises. Because Sanchez does not dispute that he maintained the premises, this difference has no bearing on our analysis, which solely focuses on cases interpreting the phrase "for the purpose of." 21 U.S.C. § 856(a)(1).

*v. Church*, 970 F.2d 401, 406 (7th Cir. 1992). Other circuits, however, have further explained that, "'in the residential context, the manufacture (or distribution or use) of drugs must be at least one of the primary or principal uses to which the house is put.'" *United States v. Shetler*, 665 F.3d 1150, 1162 (9th Cir. 2011) (*quoting United States v. Verners*, 53 F.3d 291, 296 (10th Cir. 1995)). That language almost precisely matches the application note for § 2D1.1(b)(12). The only remaining difference is that § 856(a)(1) also punishes "use" of controlled substances on the premises, 21 U.S.C. § 856(a)(1), which the sentencing enhancement does not, U.S.S.G. § 2D1.1(b)(12).

Given this similarity in language, we find informative how these other courts determined whether distributing drugs represented a "primary or principal" use of premises. The Tenth Circuit was particularly concerned with whether prohibited uses of the property included "characteristics of a business," such as "investment in the tools of the trade . . .; packaging materials . . .; financial records; profits . . .; and the presence of multiple employees or customers." *Verners*, 53 F.3d at 296-97. The Ninth Circuit took into account the presence of commercial drug transactions for profit. *Shetler*, 665 F.3d at 1162-63. Finally, in *Miller*, the Eighth Circuit summarized cases like *Shetler* as considering whether drug sales on the premises were "substantial." *Miller*, 698 F.3d at 707. Thus, in making its determination, the Eighth Circuit considered both the frequency the premises were used for the prohibited purposes and whether sales from such use were "substantial." *Id.* at 706-07.

*Miller*'s approach is persuasive. In a residential case like this one, a mere comparing of frequencies does not alone answer the question. If it did, the enhancement would never apply to those who sell drugs in their homes. Like the Eighth Circuit, we do not think Congress intended that result, especially when courts have upheld numerous convictions of individuals selling drugs out of their residences under the similarly worded 21 U.S.C. § 856(a)(1). *See, e.g.*, *United States v. West*, 671 F.3d 1195, 1196-97 (10th Cir. 2012); *United States v. Russell*, 595 F.3d 633, 637-40 (6th Cir. 2010); *Church*, 970 F.2d at 406. Notably, the Eighth Circuit's approach also conforms with our closest decision on-point, which upheld a § 856(a)(1) conviction for an individual who sold drugs from his home, when such sales were "significant." *Church*, 970 F.2d at 406.

For these reasons, we now apply *Miller*'s approach to this case. Specifically, we will consider both the frequency the prohibited uses occurred on the premises and whether those uses were significant in scope. Neither a specific frequency nor a particular significance automatically warrants applying the enhancement. Rather, we consider the two in tandem and determine whether the prohibited purpose can be fairly described as a "primary or principal" use of the premises.[5] Here, there is

---

[5] It is tempting to collapse frequency into part of a broader "significance" inquiry. The application note, however, specifically instructs us to consider frequency. Thus, despite the

(continued...)

little question as to the proper outcome, because both factors clearly warrant applying the enhancement to Sanchez.

We begin with frequency. As Sanchez points out, the PSR is vague about the specific number of drug sales that occurred in Sanchez's home. However, when read in its natural context, the report implies that *all* of the transactions occurred in the home, and it does not mention them having taken place anywhere else. (PSR at 4.) The government corroborated that interpretation at the sentencing hearing; counsel stated that it was Sanchez's "regular practice" to receive cocaine shipments at home. (Sent. Tr. at 5.) Sanchez did not challenge the statements in the PSR or the government's characterization of the events. Nor did he mention a single other place where a transaction occurred. Instead, Sanchez argued only that drugs were not kept on the premises for very long and that he primarily used the home as a residence. *(Id.* at 4.)

True, at oral argument for this appeal, Sanchez's counsel stated that transactions occurred at the home only "sometimes." But such factual disputes should have been aired in the district court. *See United States v. Sykes*,

---

[5] (...continued)

conceptual elegance of viewing frequency as an indicium of significance, we do not see it as proper to relegate the one consideration mentioned in the application note to a mere sub-factor. For that reason, we think that frequency must remain an independent part of the overall analysis.

598 F.3d 334, 339 (7th Cir. 2010) ("Sykes did not object to the PSR in the district court and therefore waived any such argument here unless he can show plain error"), *aff'd*, 131 S. Ct. 2267 (2011). In the future, if defendants dispute relevant facts about frequency, we encourage district courts to make specific findings on the issue. Here, however, Sanchez did not raise this dispute in the district court, and his counsel's vague statements on appeal do not distract us from the other persuasive evidence the government has presented. Over a two-year period, Sanchez regularly sold and stored drugs in his home. (Sent. Tr. at 4-5.) That frequency is sufficient to affirm the enhancement's application.

The significant scope of these actions removes any lingering doubt. During the two years that Sanchez sold drugs, he was the largest wholesaler in a conspiracy responsible for nearly $2.5 million in drug trafficking. He received massive amounts of cocaine in his home and garage, sometimes as much as forty kilograms at once. He would also pay Gascar-Corona for these fronted drugs from the premises. Sanchez even allowed Gascar-Corona to use the residence to meet other wholesalers.[6] Thus, in conducting this large drug trade, Sanchez used his residence not only for the drop-off, storage,

---

[6] This detail alone would not support a conviction under 21 U.S.C. § 856(a)(1). *See United States v. Banks*, 987 F.2d 463, 466 (7th Cir. 1993) ("it is not enough to open or maintain a place that is used by others for proscribed purposes"). But we think that, when considered in tandem with the other evidence presented here, it speaks to the significant scope of the transactions occurring at Sanchez's residence.

and pick-up of drugs, but also as a secure place to settle the financials. Finally, Sanchez had no legitimate job and no source of income beyond his drug sales. For these reasons, the illicit transactions occurring at the premises were significant—in quantity, in scope, and in importance to Sanchez's livelihood. Given as much, we can hardly say that Sanchez's use of the home for proscribed purposes was collateral. It was a principal use of the premises. We therefore agree with the district court's decision to apply the sentencing enhancement to Sanchez.

## C. *Procedural Error*

Reviewing a sentence involves two inquiries—one procedural and one substantive. *See United States v. Scott*, 631 F.3d 401, 408 (7th Cir. 2011). The procedural inquiry comes first; before we can review whether the district court imposed a substantively reasonable sentence, we must determine whether the court "considered the factors relevant to that exercise." *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005). We conduct this review *de novo. United States v. Grigsby*, 692 F.3d 778, 791 (7th Cir. 2012).

Proper sentencing procedure involves considering the factors enumerated in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 51 (2007); *United States v. Dean*, 414 F.3d 725, 730-31 (7th Cir. 2005). One of those factors is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Sanchez interpreted the district court's statements at the sentencing hearing to mean that the court thought itself unable to consider disparities among co-defendants as a matter of law. Sanchez thus contends that the court did not give adequate consideration to a potentially meritorious argument raised by counsel. *See United States v. Christiansen*, 594 F.3d 571, 577 (7th Cir. 2010).

In addressing this claim, we proceed carefully to avoid conflating two issues. Because the Sentencing Commission has given great attention to unwarranted disparities among similar defendants, a Guidelines range sentence, like the one Sanchez received, necessarily incorporates the concerns of 18 U.S.C. § 3553(a)(6). *See Gall*, 552 U.S. at 54; *see also United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). That said, a district court can go beyond the Sentencing Commission's generalized consideration of the issue and take into account disparities among particular co-defendants. *See Bartlett*, 567 F.3d at 908-09. If the district court was unaware of that additional discretion, that, too, can be a procedural error. *See id.* Thus, we need not consider whether the district court incorporated the concerns of § 3553(a)(6); by imposing a Guidelines sentence, it necessarily did. Rather, we ask whether the district court knew it had the even further power to lower Sanchez's sentence in light of his co-defendant's punishment.

Looking at the record, we are convinced that the district court did not think it was forbidden from considering potential disparities among co-defendants. Instead, it simply declined to give weight to a

speculative sentence. The district court indeed said that "the Seventh Circuit does not look with approval" on comparing sentences among co-defendants. (Sent. Tr. at 20.) The district court, however, gave an even more important reason for not considering Gascar-Corona's sentence: it had not yet been decided. As the court said, it would be "just one step beyond speculation" to consider a not-yet-imposed sentence. (*Id.* at 19.) Yes, the court had access to the government's recommended sentence for Gascar-Corona. But the court was still a long way from determining whether it would accept that recommendation. In fact, over a year after Sanchez's sentencing hearing, Gascar-Corona still has not been sentenced. We thus find that the district court knew it had the ability to lower Sanchez's sentence and committed no procedural error.

D.  *Substantive Error*

We now turn to the second part of reviewing a sentence—whether the penalty was "substantively reasonable." *Scott*, 631 F.3d at 408. Under the procedural inquiry, we have "satisf[ied] ourselves" that the court "exercised [its] discretion," *Cunningham*, 429 F.3d at 679, so we review the substance of its determination for abuse of discretion, *Grigsby*, 692 F.3d at 791. Furthermore, we presume any sentence within a properly calculated Guidelines range is reasonable. *United States v. Vallar*, 635 F.3d 271, 279 (7th Cir. 2011). Because the district court gave Sanchez the lowest possible sentence within the correct Guidelines range, that presumption

applies here. The burden falls on Sanchez to rebut the presumption, *see id.*, but he cannot do so. Sanchez only alleges that his sentence was unreasonable in light of his cooperation attempts and the potential disparity with Gascar-Corona's sentence. Neither claim persuades us that the district court abused its discretion.

During the sentencing colloquy, the district court acknowledged Sanchez's efforts to cooperate but also took note of the fact that those efforts yielded no fruit for the government. (Sent. Tr. at 20-21.) The court explained that, in recognition of such cooperation, it was persuaded to accept the government's recommendation for a sentence at the low end of the Guidelines range. (*Id.* at 24.) The court took Sanchez's cooperation attempts into account and even rewarded him for them. We think this approach was entirely reasonable. Sanchez received some compensation for his efforts but did not reap an even larger benefit because his tips did not materially help the government. Using such a tangible criterion to determine how much a defendant is rewarded for cooperation strikes us as fair, and it certainly does not rebut a presumption of reasonableness.

Finally, Sanchez does not convince us that the district court acted unreasonably in declining to give him a sentence closer to Gascar-Corona's recommended punishment. As we said earlier, the district court had not yet sentenced Gascar-Corona and was a long way from doing so. It makes no sense for the court to alter what it has found to be a fair sentence in this case based upon the speculated punishment of another individual.

Furthermore, any difference between the sentences was warranted, given the significant difference in the helpfulness of the Gascar-Corona's information. *See United States v. Matthews*, 701 F.3d 1199, 1204-05 (7th Cir. 2012) ("[Section] 3553(a)(6) disallows *unwarranted* sentence disparities, not all sentence differences. A sentencing *difference* is not a forbidden 'disparity' if it is justified by legitimate considerations . . . .") (internal citation, quotation marks, brackets, and ellipses omitted).

For these reasons, Sanchez has not rebutted the presumption that his sentence was substantively reasonable. As we have said before, the lowest possible sentence recommended by the Guidelines, like the one Sanchez received, "will almost never be unreasonable." *United States v. Leiskunas*, 656 F.3d 732, 737 (7th Cir. 2011); *Vallar*, 635 F.3d at 279; *United States v. Tahzib*, 513 F.3d 692, 695 (7th Cir. 2008). That statement holds true again today. We find that the district court did not abuse its discretion in imposing the sentence it did.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM Sanchez's sentence.