# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-3701

_____

United States of America

*Plaintiff - Appellee*

v.

Daniel Miller

*Defendant - Appellant*

_____

No. 11-3737

_____

United States of America

*Plaintiff - Appellee*

v.

Rebecca Miller

*Defendant - Appellant*

_____

Appeals from United States District Court
for the Western District of Arkansas - Texarkana

_____

Submitted: June 12, 2012
Filed: October 31, 2012

_____

Before LOKEN, GRUENDER, and BENTON, Circuit Judges.

_____

LOKEN, Circuit Judge.

Between October and December 2010, informant Colin Dorsey made four controlled methamphetamine buys from Daniel Miller at the home of Daniel and his wife, Rebecca Miller. When Mr. Miller was arrested and interviewed in February 2011, he admitted distributing enough methamphetamine between 2004 and 2010 to fill the conference room in which the interview was being conducted, receiving as much as two kilograms per week from his suppliers. Interviewed that same day, Mrs. Miller admitted that on several occasions she and her 17-year-old son assisted in the distribution of methamphetamine, including three occasions when she received money from Dorsey at the Millers' home.

Mr. and Mrs. Miller were charged with conspiracy to distribute 500 grams or more of a methamphetamine mixture in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), and 846. Based on Colin Dorsey's four controlled buys, Mr. Miller was charged with four counts of aiding and abetting the distribution of more than 5 grams of actual methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii), and 18 U.S.C. § 2. Mrs. Miller was charged with three counts of aiding and abetting based on the three buys in which she participated. A jury found the Millers guilty on all counts, except it found Mrs. Miller guilty of conspiring to distribute only 50 grams or more of methamphetamine. Mr. Miller was sentenced to 360 months in prison. Mrs. Miller was sentenced to 188 months in prison. Both appeal. Mrs. Miller argues the evidence was insufficient to support her conviction. Mr. Miller argues the district court erred in denying pretrial discovery requests. Both challenge a two-level sentencing enhancement for maintaining their home for the purpose of distributing a controlled substance. We reject these contentions and affirm both convictions and Mr. Miller's sentence. Mrs. Miller further argues the district

court committed procedural sentencing error in determining that her advisory guidelines sentencing range was 188-235 months in prison. We agree with this contention, vacate Mrs. Miller's sentence, and remand for resentencing.

## I. Sufficiency of the Evidence

Mrs. Miller argues the trial evidence was insufficient to prove beyond a reasonable doubt that she aided or abetted the distribution of methamphetamine or intentionally joined a conspiracy to distribute 50 grams or more of methamphetamine. "We review the sufficiency of the evidence de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." United States v. Guenther, 470 F.3d 745, 747 (8th Cir. 2006) (quotation omitted).

The government introduced evidence that on October 8, 2010, Dorsey called Mr. Miller to purchase methamphetamine. Mr. Miller told Dorsey to come to his home. When Dorsey arrived, Mr. Miller was not home. Dorsey called Mr. Miller, who told Dorsey to give the $900 purchase money to Mrs. Miller. When Dorsey gave Mrs. Miller the money, she said "Okay." Dorsey again called Mr. Miller, who said Dorsey would find the methamphetamine in a shoe on the rafter of the front porch. This buy involved 14.7 grams of actual methamphetamine in a mixture weighing 21.8 grams. On October 20, Dorsey called Mr. Miller and arranged another buy. When Dorsey arrived at the Millers' residence, neither Mr. Miller nor Mrs. Miller was home. Mrs. Miller and their 17-year-old son soon arrived. Dorsey called Mr. Miller, who told Dorsey to give Mrs. Miller the money. The Millers' son then retrieved the methamphetamine and gave it to Dorsey. This buy involved 17.7 grams of actual methamphetamine in a mixture weighing 21.6 grams. On December 2, Dorsey called Mr. Miller and set up another buy at Mr. Miller's home. When Dorsey arrived, Mr. Miller was not home; Mrs. Miller answered the door. Mr. Miller told Dorsey by phone to give the money to Mrs. Miller and then said Dorsey would find the

methamphetamine above a barbeque pit on the property. This purchase involved 17.5 grams of actual methamphetamine in a mixture weighing 26.2 grams. In addition to admitting receiving money from Dorsey in these three transactions, Mrs. Miller admitted that over the prior twelve months she had accepted money for methamphetamine from two other individuals at the Millers' residence.

The elements of aiding and abetting the distribution of a controlled substance are: "(1) the defendant associated herself with the unlawful venture; (2) the defendant participated in it as something she wished to bring about; and (3) the defendant sought by her actions to make it succeed." United States v. Ellefson, 419 F.3d 859, 863 (8th Cir. 2005) (quotation omitted). Mrs. Miller argues the government failed to prove she possessed the necessary intent to be guilty of aiding and abetting. She further argues the government failed to establish an essential element of a drug conspiracy offense, that she "intentionally joined the conspiracy." United States v. Jiminez, 487 F.3d 1140, 1146 (8th Cir. 2007) (quotation omitted). We disagree. Based on Mrs. Miller's admissions that she accepted money for drugs on prior occasions and received money from Dorsey on three occasions when he came to her home and left with methamphetamine, a reasonable jury could find she intentionally participated in completing three methamphetamine transactions. This same evidence was sufficient for the jury to find beyond a reasonable doubt that Mrs. Miller was a knowing member of the conspiracy, even if she played a relatively minor role compared to Mr. Miller. See United States v. Lopez, 443 F.3d 1026, 1030-31 (8th Cir.) (en banc), cert. denied, 549 U.S. 898 (2006).

Alternatively, Mrs. Miller argues there was insufficient evidence to support the jury's finding that she conspired to distribute 50 grams or more of a mixture containing methamphetamine. We disagree. Mrs. Miller *personally* participated in three transactions involving a total of more than 50 grams of a methamphetamine mixture. These transactions clearly were "reasonably foreseeable drug quantities that were in the scope of the criminal activity that [she] jointly undertook." United States

v. Foxx, 544 F.3d 943, 951 (8th Cir. 2008) (quotation omitted), cert. denied, 130 S. Ct. 91 (2009).

## II. Mr. Miller's Discovery Motion

Three weeks before trial, Mr. Miller filed a Motion for Additional Discovery Regarding Cooperating Witness requesting, in twenty numbered subparagraphs, that the government produce for inspection and copying a variety of documents concerning "cooperating" and "prospective government" witnesses. The motion relied on Rule 16 of the Federal Rules of Criminal Procedure and on Brady v. Maryland, 373 U.S. 83 (1963). In response, the government objected to being required to disclose its witnesses prior to trial and stated that it would provide exculpatory and impeachment evidence that it was required to disclose under Brady "prior to cross-examination of the cooperating witness should he/she be called as a witness" at trial. Four days before trial, the district court granted the motion in substantial part, ordering the government to provide the requested information "prior to the cross-examination of the witness." There is no contention the government failed to comply with this directive.

On appeal, Mr. Miller challenges one portion of the district court's ruling, the denial of his request for the "case names and numbers of any trials or evidentiary hearings at which any cooperating witness has testified." He argues this ruling violated Brady, Rule 16(a)(1)(E)(i), and the Sixth Amendment's Confrontation Clause. This contention is without merit; indeed, it was not properly preserved.

Rule 16(a)(1)(E)(i) provides that, upon a defendant's request, the government must produce for inspection and copying documents "material to preparing the defense." In 1975, Congress amended Rule 16 to eliminate a requirement that the government disclose its witnesses prior to trial. See Pub. L. 94-64, § 3(23), 89 Stat. 370, 375; Rule 16 Advisory Committee Notes to the 1975 Enactment relating to

Rules 16(a)(1)(E) and (b)(1)(C).[1] Mr. Miller's pretrial discovery motion was a thinly-disguised attempt to learn through discovery who the government was likely to call as trial witnesses. The government properly objected, and the district court did not abuse its discretion by ordering the government to provide discovery "prior to cross-examination" of any cooperating witness at trial. See United States v. Roach, 28 F.3d 729, 734 (8th Cir. 1994); United States v. Rogers, 549 F.2d 490, 494 & n.4 (8th Cir. 1976), cert. denied, 431 U.S. 918 (1977); United States v. Taylor, 542 F.2d 1023, 1026 & n.1 (8th Cir. 1976), cert. denied, 429 U.S. 1074 (1977). Nor was this a violation of the government's obligations under Brady. "Brady is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation." United States v. Krauth, 769 F.2d 473, 476 (8th Cir. 1985) (quotation omitted).

At trial, the only cooperating witness who testified was Colin Dorsey. Dorsey testified on direct examination that he cooperated with the government in making the controlled buys after he was arrested for drug possession, that he did so in exchange for the government's promise to make his cooperation known to the local district attorney, and that he was paid for these efforts and had been paid by law enforcement for work on other past cases. Mr. Miller cross-examined Dorsey for bias, and the district court in no way limited this cross examination. Mr. Miller made no showing that he was being denied effective cross-examination, or his right to confront Dorsey, because the government had failed to provide exculpatory or impeachment materials required either by Brady or by the district court's discovery order. Thus, he failed to establish a Brady violation by showing "the government suppressed evidence that was favorable to the defendant and material either to guilt or to punishment." United States v. Heppner, 519 F.3d 744, 750 (8th Cir.), cert. denied, 555 U.S. 909 (2008). Mr. Miller argues that all prior cases at which a cooperating witness testified must be

---

[1]This had been the rule before a 1974 amendment required the government to disclose its witnesses before trial. See United States v. Cole, 453 F.2d 902, 905 (8th Cir.), cert. denied, 406 U.S. 922 (1972).

disclosed because an "informant's cooperation . . . suggests a motive for him to engage in improper conduct." He cites no circuit decision applying <u>Brady</u> so broadly.

Mr. Miller further argues that the district court abused its discretion by denying his request for production of any presentence investigation report (PSR) prepared for a cooperating witness without conducting an *in camera* review to determine if it contained impeachment evidence. In its response to Mr. Miller's pretrial motion, the government stated it would provide "any evidence which is contained in such a report which is required to be disclosed under <u>Brady v. Maryland</u> . . . prior to the cross-examination of any witness to which such impeachment evidence applies." Mr. Miller did not renew this request before cross examining Dorsey, the only cooperating witness who testified at trial. We have held that a district court should conduct an *in camera* review of a PSR if "the government has recognized the possibility that the PSR contains <u>Brady</u>/<u>Giglio</u> information and requested *in camera* review." <u>United States v. Huggans</u>, 650 F.3d 1210, 1226 (8th Cir. 2011) (quotation omitted), <u>cert. denied</u>, 132 S. Ct. 1583 (2012). But here, neither party asked the court to review a PSR *in camera*. Moreover, to obtain access to another person's PSR, a defendant must make a "showing of special need." <u>United States v. Jewell</u>, 614 F.3d 911, 921 (8th Cir. 2010) (quotation omitted), <u>cert. denied</u>, 131 S. Ct. 1677 (2011). As Mr. Miller made no such showing, there was no abuse of discretion.

### III. The "Crack House" Sentencing Enhancement

Mr. and Mrs. Miller both argue the district court committed procedural sentencing error by imposing a two-level increase for "maintain[ing] a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12). We review factual findings that the Millers maintained the premises for the purpose of distributing methamphetamine for clear error. <u>See</u> <u>United States v. Baker</u>, 200 F.3d 558, 563 (8th Cir. 2000) (standard of review).

In the Fair Sentencing Act of 2010, Congress directed the Sentencing Commission to add a two-level enhancement if "the defendant maintained an establishment for the manufacture or distribution of a controlled substance, as generally described in section 416 of the Controlled Substances Act (21 U.S.C. 856)." Pub. L. No. 111-220, § 6(2), 124 Stat. 2372, 2373 (2010). This statute, commonly known as the "crack-house" statute, makes it unlawful to "knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance." 21 U.S.C. § 856(a)(1); see United States v. Verners, 53 F.3d 291, 293 (10th Cir. 1995).[2]

On appeal, Mr. Miller argues there was insufficient evidence he "maintained" the premises for the distribution of controlled substances because his use of the house to deliver methamphetamine on four occasions in late 2010 "does not qualify as maintaining premises for drug distribution." Among the factors a court considers in determining whether a defendant "maintained" premises for drug distribution are (A) whether he or she owned or rented the premises, and (B) the extent to which he or she controlled access to, or activities at, the premises. § 2D1.1, comment. (n.28). "Where the defendant lives in the house, this element is normally easily proved." Verners, 53 F.3d at 296 (citation omitted).

Here, though it is unclear who owned the premises, Mr. and Mrs. Miller lived there, used the home as their primary residence, and controlled access to the property. In addition to the four controlled buys, the government presented evidence Mr. Miller admitted that he distributed massive quantities of methamphetamine between 2004 and 2010, that he told customers they would find the methamphetamine in unusual locations such as beside a fence post and he would collect the purchase price at a later

---

[2]Prior to 2003, § 856(a)(1) made it unlawful to "knowingly open or maintain any place for the purpose of manufacturing, distributing, or using any controlled substance." The 2003 amendment did not affect the issue in this case.

time, and that he kept ledgers with the names and locations of suppliers and customers that the government recovered and presented at trial. On October 22, 2010, Mr. Miller reported to local law enforcement officers that someone had planted ten grams of methamphetamine in his home and tried to convince the officers to use him as a confidential informant, claiming to know every drug dealer in the area. The district court did not clearly err in finding that Mr. Miller "maintained" the premises for drug distribution.

Mrs. Miller argues that she did not maintain the home "for the purpose of" distributing controlled substances. Application Note 28 to § 2D1.1 instructs that

> Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

Focusing on the frequency-of-use factor and her minimal role in her husband's criminal enterprise, Mrs. Miller argues that her primary use of the premises was as a family home, where she resided with her husband and raised eleven children, their own and children of Mr. Miller's sisters.

We assume that § 2D1.1(b)(12), like the 21 U.S.C. § 856(a)(1) offense that it parallels, requires proof that the specific defendant being sentenced maintained the premises "for the purpose of" drug manufacture or distribution. "It is not sufficient that others possess the requisite purpose." United States v. Payton, 636 F.3d 1027, 1043 (8th Cir.) (quotation omitted), cert. denied, 132 S. Ct. 349 (2011). However, consistent with decisions applying § 856, Application Note 28 provides that drug

manufacturing or distribution need only be "one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." Here, there was direct evidence Mrs. Miller used the premises for the purpose of actively participating in at least three controlled buys on the property, and she admitted accepting payments that she knew were for methamphetamine purchases on other occasions. In two of the controlled buys, Mrs. Miller's teenage son helped deliver the methamphetamine to purchaser Dorsey. These drug distribution activities were more than an "incidental or collateral" use of the premises by Mrs. Miller.

We are somewhat baffled by Application Note 28's instruction to compare the frequency of lawful and unlawful uses in this type of case. When the premises in question was the defendant's family home, by definition it was used for that lawful purpose 100% of the time. Yet Congress in enacting § 856 and in directing the Commission to adopt § 2D1.1(b)(12) surely intended to deter the manufacture and distribution of illegal drugs in "crack houses" where children are being raised. Thus, prior decisions have upheld § 856 convictions where defendant used the premises in question as a primary residence as well as for substantial drug trafficking. See United States v. Shetler, 665 F.3d 1150, 1163 (9th Cir. 2011); United States v. McCullough, 457 F.3d 1150, 1161 (10th Cir. 2006), cert. denied, 549 U.S. 1136 (2007); United States v. Church, 970 F.2d 401, 406 (7th Cir. 1992), cert. denied, 506 U.S. 1065 (1993). Likewise, we conclude, § 2D1.1(b)(12) applies when a defendant uses the premises for the purpose of substantial drug-trafficking activities, even if the premises was also her family home at the times in question. Thus, the district court did not clearly err in finding that Mrs. Miller's use of the premises for the distribution of methamphetamine warranted a two-level increase under § 2D1.1(b)(12).

### IV. Mrs. Miller's Advisory Guidelines Range

Mrs. Miller's initial PSR stated that the offense conduct was three controlled buys by a confidential informant (Dorsey) and the relevant conduct was a fourth buy, resulting in a base offense level of 32 based on 64 total grams of actual methamphetamine. Daniel Miller's initial PSR likewise recommended a base offense level of 32 based on 64 grams of actual methamphetamine, with all four controlled buys being offense conduct for Daniel. The government objected that Daniel's base offense level should be 38 because he admitted distributing more than 15 kilograms of methamphetamine over a lengthy period. The government objected that Mrs. Miller's base offense level should also be 38 because "she was convicted as a part of the same conspiracy as Mr. Miller." Mrs. Miller objected that the fourth buy should not be included in her drug quantity. The probation officer agreed with the government. However, the revised PSR mistakenly listed a base offense level of 38 "based on a total of 64 grams of actual methamphetamine," rather than on more than 15 kilograms of methamphetamine. The revised PSR rejected Mrs. Miller's objection to including the fourth buy because she was "convicted of a conspiracy charge."

The revised PSR also recommended the two-level increase under § 2D1.1(b)(12) previously discussed, a two-level increase under § 3B1.4 for using her minor son to commit the offense, and no adjustment for role in the offense. Mrs. Miller objected to both increases and urged a four-level reduction because she was a minimal participant in the conspiracy under § 3B1.2(a).

At sentencing, the district court ruled on these revisions and objections based on the trial record. The court upheld the revised base offense level of 38. Without making a specific quantity finding or noting that the revised PSR's total of 64 grams of actual methamphetamine is level 32, not level 38, the court observed:

-11-

The conspiracy was more than just the counts as such. It covered the whole range of criminal conduct under what we call "relevant conduct." So the court ruled that Mrs. Miller was convicted of conspiracy. She should be charged with the entire amount of those drugs.

The court then rejected Mrs. Miller's objection to including the fourth buy because "you were convicted of a conspiracy and a conspiracy covers the entire range of conduct." However, the court granted a four-level reduction, finding Mrs. Miller a minimal participant in the conspiracy, and rejected a two-level increase for use of a minor in committing the offense because "Mr. Miller was more involved in the use of your son that you were." These findings resulted in a total offense level of 36 and, with a criminal history category of I, an advisory guidelines range of 188-235 months in prison. The court sentenced Mrs. Miller to the bottom of that range, 188 months.

This record presents two procedural sentencing issues that lead us to conclude we should remand for resentencing. First, it appears no one at sentencing recognized that the district court's finding that Mrs. Miller was entitled to a four-level minimal-role adjustment brought into play an amendment to the "mitigating role cap" in § 2D1.1(a)(5) mandated by the Fair Sentencing Act of 2010: "If the resulting offense level is greater than level 32 [after a § 3B1.2 mitigating role adjustment] and the defendant receives the 4-level ("minimal participant") reduction in § 3B1.2(a), decrease [the base offense level] to level 32." See U.S.S.G. App. C, Vol. III, Amend. 748, at p.382 (2011); Pub. L. No. 111-220, § 7(1), 124 Stat. 2372, 2374 (2010). Here, the PSR recommended no role adjustment, so it did not consider § 2D1.1(a)(5). Mrs. Miller in urging a minimal role adjustment did not bring the mitigating role cap to the district court's attention, even after the court announced at sentencing it was granting the adjustment. Because the court started with a base offense level of 38, it determined that Mrs. Miller's total offense level was 36 after the adjustment (and the premises enhancement). Even under plain error review, the failure to apply amended § 2D1.1(a)(5) resulted in an erroneous application of the Guidelines that may have

substantially increased Mrs. Miller's advisory guidelines range, making remand appropriate. See United States v. Jackson, 410 F.3d 939, 941-42 (7th Cir. 2005).

Second, the confused sentencing record leaves us with doubt concerning the district court's drug quantity finding. The district court correctly ruled that, in determining the base offense level for her drug conspiracy offense, Mrs. Miller is responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B), explaining Relevant Conduct principles that underly Guidelines sentencing. However, "the emphasis under § 1B1.3 is the scope of the *individual defendant's* undertaking and foreseeability in light of that undertaking, rather than the scope of the conspiracy as a whole." United States v. Spotted Elk, 548 F.3d 641, 674 (8th Cir. 2008) (emphasis in original), cert. denied, 556 U.S. 1145, 1194, 1265 (2009); see § 1B1.3, comment. (n.2). Therefore, before attributing drug transactions conducted by other conspirators to the defendant, the sentencing court must find that the transactions were

> in furtherance of the conspiracy and either known to that defendant or reasonably foreseeable to [her]. Factors relevant to foreseeability include whether the defendant benefited from [her] co-conspirator's activities and whether [she] demonstrated a substantial level of commitment to the conspiracy.

United States v. Brown, 148 F.3d 1003, 1008 (8th Cir. 1998) (citation omitted), cert. denied, 525 U.S. 1169 (1999). The extent to which specific findings are required will of course vary with the circumstances surrounding a particular defendant and her conspiracy offense.

In this case, the drug quantity in the initial PSR was 64 grams of actual methamphetamine sold to Dorsey in four controlled buys over a three-month period. Mrs. Miller objected to including the fourth buy as relevant conduct. The district court's overruling of that objection required nothing more than a cryptic reference to

-13-

the conspiracy nature of her offense. But the revised PSR had increased the base offense level from 32 to 38, accepting the government's objection that Mrs. Miller's base offense level should be based upon Mr. Miller's boastful admissions that he distributed more than 15 kilograms of methamphetamine during the course of his six-year conspiracy. No doubt more than 64 grams of actual methamphetamine could reasonably be attributed to Mrs. Miller. Not only was she Mr. Miller's wife who lived with him in premises they used for drug distribution, she also admitted accepting money for methamphetamine from two other individuals in the prior year. But the government asserted she was responsible for the entire 15 kilograms simply because she "was convicted as a part of the same conspiracy as Mr. Miller." This was contrary to well-established Eighth Circuit precedent. See Spotted Elk, 548 F.3d at 674 ("a defendant's conviction for conspiracy does not automatically mean that every conspirator has foreseen the total quantity of drugs involved in the entire conspiracy"); United States v. Rogers, 982 F.2d 1241, 1245-46 (8th Cir.) (remanding because the district court attributed all quantities implicated in the conspiracy based solely on defendant's conspiracy conviction), cert. denied, 509 U.S. 912 (1993).

Our uncertainty is amplified because the revised PSR increased the base offense level from 32 to 38 without revising the drug quantity from 64 grams of actual methamphetamine to 15 kilograms of methamphetamine. In upholding the revised base offense level, the district court made no reference to drug quantity. It simply found: "Mrs. Miller was convicted of conspiracy. She should be charged with the entire amount of those drugs." As the only relevant conduct issue the court explicitly considered was to deny Mrs. Miller's objection to including the fourth buy, the record leaves in doubt whether the court was aware that this cryptic comment resulted in a thirty-fold increase in the drug quantity finding,[3] based primarily on Mr. Miller's activities, and despite the jury's finding of a lesser quantity than charged in the indictment and the court's grant of a minimal role adjustment. In these

---

[3]Compare § 2D1.1(c)(1) with § 2D1.1(c)(4).

circumstances, we conclude that the interests of justice are well-served by a remand for resentencing following a redetermination of Mrs. Miller's advisory guidelines range. This seems particularly appropriate because, the day after Mrs. Miller's sentencing, the district court in sentencing Mr. Miller adopted his argument for base offense level 32, without a specific drug quantity finding, in order to reduce his advisory guidelines range from life to 360 months-to-life. Whether this was a reduced drug quantity finding or a *de facto* downward variance is in our view unimportant. It simply reinforces our view that, in this post-<u>Booker</u> world, a remand for resentencing in this case is needed.

For the foregoing reasons, we affirm Daniel Miller's conviction and sentence. We affirm Rebecca Miller's conviction, vacate her sentence, and remand to the district court for resentencing not inconsistent with this opinion.

———————————————