# United States Court of Appeals
## For the First Circuit

No. 21-1688

UNITED STATES OF AMERICA,

Appellee,

v.

ANDY MELENDEZ-ROSADO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Gelpí, Selya, and Thompson,
Circuit Judges.

Allan Amir Rivera-Fernández on brief for appellant.
W. Stephen Muldrow, United States Attorney, Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, and Maarja T. Luhtaru, Assistant United States Attorney, on brief for appellee.

January 9, 2023

**SELYA**, **Circuit Judge**.  This sentencing appeal presents an issue of first impression in this circuit:  may the so-called stash-house enhancement, see USSG §2D1.1(b)(12), be imposed in circumstances in which a particular dwelling is both the residence of the defendant and his family and a place where drug-distribution activities regularly occur?  We answer this question in the affirmative, concluding that a particular premises may have more than one principal use.  To complete our task, we uphold the district court's factual findings, dispose of the defendant's other claims of error, and affirm the challenged sentence.

## I

We briefly rehearse the relevant facts and travel of the case.  "Where, as here, a sentencing appeal follows a guilty plea, we glean the relevant facts from the change-of-plea colloquy, the unchallenged portions of the presentence investigation report (PSI Report), and the record of the disposition hearing." United States v. Vargas, 560 F.3d 45, 47 (1st Cir. 2009).

In June of 2020, Puerto Rico police officers began investigating possible drug-related activity at the Los Mirtos Public Housing Project in Carolina, Puerto Rico.  This investigation was sparked by information provided by a confidential informant.  According to the informant, the person living in Unit 97 was selling drugs for defendant-appellant Andy Melendez-Rosado (who lived in Unit 85).

- 2 -

On July 2, the officers observed an individual receiving a fanny pack on the balcony of Unit 85. That individual then carried out two suspected drug sales: one on his way to Unit 97 and another on the balcony of Unit 97. The next day, a suspected drug user went to Unit 97 and gave an adult occupant cash. The occupant asked that person to wait, went to the balcony of Unit 85, interacted there with an unidentified person, received a bag, and returned to Unit 97 to complete a drug sale.

About a week later, the officers executed a search warrant for Unit 85. The defendant lived in the unit with two of his children, and the three of them (along with two other children) were on the premises at the time of the search. The officers saw crack cocaine on a kitchen counter and in a cooking strainer. They found two sets of scales and a black bag containing (among other things) heroin, drug paraphernalia, and plastic baggies of the sort used to package drugs. They also found $705 in cash. In the bathroom, the officers discovered three magazines fully loaded with .40-caliber ammunition. In one bedroom, they turned up baggies containing heroin and fentanyl. And in another bedroom, they turned up a .40-caliber firearm equipped with a full magazine. The total drugs seized included 682 baggies of heroin, two bags of crack cocaine, two bags of marijuana, and a quantity of fentanyl.

After waiving his Miranda rights, see Miranda v. Arizona, 384 U.S. 436, 444-45 (1966), the defendant admitted owning

both the drugs and the firearm seized during the search. What is more, he admitted that he controlled a drug point and that he possessed the firearm in furtherance of his drug-related activities.

The seized drugs were tested and weighed. The drug quantities amounted to 43.2 grams of heroin, 30.4 grams of crack cocaine, 67.47 grams of fentanyl, and 31.11 grams of marijuana.

In due course, a federal grand jury sitting in the District of Puerto Rico returned a five-count indictment, which charged the defendant with possession with intent to distribute marijuana (count 1), see 21 U.S.C. § 841(a)(1); possession with intent to distribute cocaine base (count 2), see id.; possession with intent to distribute heroin (count 3), see id.; possession of a firearm in furtherance of a drug trafficking crime (count 4), see 18 U.S.C. § 924(c)(1)(A); and possession of a firearm and ammunition as a convicted felon (count 5), see id. § 922(g)(1). Although the defendant initially maintained his innocence, he later entered into a plea agreement with the government and pleaded guilty to counts 2 and 4.

After accepting his guilty plea, the district court ordered the preparation of a PSI Report. When received, the PSI Report recommended, as relevant here, a two-level stash-house enhancement for "maintain[ing] a premises for the purpose of manufacturing or distributing a controlled substance." USSG

- 4 -

§2D1.1(b)(12). The defendant objected to this enhancement because it was based on "[a]n assumption" and lacking in factual support.

The probation office held firm: although it acknowledged that the defendant and his family had lived in Unit 85 for about a year, it noted various facts linking Unit 85 to the drug-distribution business. Among other things, surveillance records showed that an individual had gone to the defendant's apartment (Unit 85) "and received drugs for further sale/distribution"; a lawful search of the apartment disclosed that the defendant had significant quantities of drugs and drug paraphernalia, along with a firearm; and the defendant himself had "admitted [that] he control[led] a drug point."

The PSI Report also attributed a criminal history score of six points to the defendant, which placed him in criminal history category (CHC) III. The defendant objected to this score, challenging the attribution of a single criminal history point for a 2012 arrest for possession of cocaine with intent to distribute. The defendant claimed that he had successfully completed a diversionary program and that there had been no admission of guilt. Once again, the probation office disagreed with the defendant's objection, asserting that it had secured documentary proof to the effect that "the defendant entered a plea of guilty on January 23, 2013."

Once the dust had settled, the probation office compiled an amended PSI Report and recommended a total offense level of twenty-seven and a CHC of III. These recommendations yielded a guideline sentencing range of eighty-seven to 108 months for count 2. The guideline sentencing range for count 4 was sixty months — the statutory mandatory minimum. See 18 U.S.C. § 924(c)(1)(A)(i). Additionally, the probation office cautioned that the sentence on count 4 had to be imposed to run consecutively to the sentence on count 2. See id. § 924(c)(1)(D)(ii).

At the disposition hearing, defense counsel sought a sentence of sixty months on count 2, to be followed by a consecutive sentence of sixty months on count 4. The government joined this recommendation (as it had promised to do in the plea agreement). After hearing the arguments of counsel and the defendant's allocution, the district court adopted the guideline calculations limned in the amended PSI Report. The court then turned to the sentencing factors adumbrated in 18 U.S.C. § 3553(a). The court considered, among other things, the defendant's age, education, employment, history of marijuana use, and offense conduct.

In the end, the court determined that an eighty-seven-month term of immurement on count 2, followed by a sixty-month term of immurement on count 4, comprised the appropriate sentence.

The court imposed that sentence and dismissed the remaining counts. This timely appeal ensued.

## II

"Appellate review of claims of sentencing error entails a two-step pavane." United States v. Matos-de-Jesús, 856 F.3d 174, 177 (1st Cir. 2017). Under this bifurcated framework, we first assay any claims of procedural error. See id. If the sentence passes procedural muster, we then assay any claim of substantive unreasonableness. See id.

At both steps of this pavane, "we review preserved claims of error for abuse of discretion." United States v. Rivera-Morales, 961 F.3d 1, 15 (1st Cir. 2020). "The abuse-of-discretion standard is not monolithic: within it, we review the sentencing court's findings of fact for clear error and questions of law . . . de novo." Id.

### A

We start with the defendant's claims of procedural error. The first such claim targets the district court's deployment of the two-level stash-house enhancement. See USSG §2D1.1(b)(12). Although the parties quibble over whether this claim of error was appropriately raised below, we need not resolve that disagreement. Instead, we assume — favorably to the defendant — that the claim was preserved and that review is therefore for abuse of discretion.

- 7 -

The stash-house enhancement provides that a defendant's base offense level shall be increased by two levels "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." Id. An application note explains that this enhancement "applies to a defendant who knowingly maintains a premises . . . for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution." USSG §2D1.1, cmt. n.17. The application note further explains that "[m]anufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." Id.

Here, the defendant does not seriously contest that he maintained the premises (that is, the apartment). Nor could he: the record is pellucid that the defendant rented the apartment (Unit 85) and resided in it with his two children. Moreover, he conceded that he owned numerous items of personal property kept in the apartment (such as the drugs, the drug paraphernalia, the firearm, and the ammunition). A defendant who — like this defendant — occupies and controls a particular premises for a significant period of time maintains those premises within the

meaning of the stash-house enhancement.  See United States v. Soto-Villar, 40 F.4th 27, 35-36 (1st Cir. 2022).

Even so, the defendant hotly contests whether he maintained the apartment "for the purpose of manufacturing or distributing a controlled substance."  The principal use of the apartment, he asserts, was as a familial residence.

The baseline understanding upon which this argument rests is faulty.  The argument assumes that there is only one primary or principal use for a premises.  The application note, however, does not set up an either/or proposition.  Rather, it speaks in terms of "one of the defendant's primary or principal uses."  USSG §2D1.1, cmt. n.17 (emphasis supplied).  That language unmistakably signifies that there may be more than one primary or principal use for a premises.  See United States v. Galicia, 983 F.3d 842, 844 (5th Cir. 2020); United States v. Sanchez, 710 F.3d 724, 729 (7th Cir.), vacated on other grounds, 134 S. Ct. 146 (2013).  Consequently, a premises that principally serves as a family residence may also principally serve as a site for the manufacturing or distribution of a controlled substance.

In concluding that a premises may have two or more primary or principal uses — for example, as a family residence and as a drug distribution facility — we do not write on a pristine page.  Other courts have held that the stash-house enhancement is applicable because a premises has principal uses both as a

residence and as a site for the distribution of drugs.  See, e.g., Galicia, 983 F.3d at 844; United States v. Lozano, 921 F.3d 942, 946 (10th Cir. 2019); Sanchez, 710 F.3d at 729-30; United States v. Miller, 698 F.3d 699, 707 (8th Cir. 2012).  Seen in this light, the question before us reduces to whether it was appropriate for the district court to find that distributing controlled substances was a principal use of the defendant's apartment.

Whether the distribution of controlled substances constitutes a principal use of a premises is a fact-sensitive question.  Ordinarily, the answer to this question "may be inferred from the totality of the circumstances."  United States v. Jones, 778 F.3d 375, 385 (1st Cir. 2015).  Pertinent circumstances typically include the activities observed, the quantity of drugs discovered, and the presence or absence of drug paraphernalia and tools of the trade.  See id.  Relatedly, application note 17 suggests consideration of "how frequently the premises was used by the defendant for . . . distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes."[1]  USSG §2D1.1, cmt. n.17.

_____

[1] Like the Eighth Circuit, we are "somewhat baffled" by the application note's instruction to compare the frequency of lawful and unlawful uses when the particular premises is the defendant's residence.  Miller, 698 F.3d at 707.  As the Eighth Circuit observed "[w]hen the premises in question [i]s the defendant's family home, by definition it [i]s used for that lawful purpose 100% of the time."  Id.  For this reason, the Eighth Circuit gives greater weight to other factors (such as the type of activities

In the case at hand, the district court's factfinding (including its adoption of the PSI Report's account of the offense of conviction) convincingly established that a principal use of the apartment was for the distribution of drugs. The court noted that a search of the apartment revealed, among other things, quantities of heroin, cocaine, fentanyl, and marijuana. These quantities included a retail-sized inventory of heroin: 682 baggies. Moreover, the search revealed crack cocaine being cooked in the kitchen, an abundance of drug paraphernalia (including two sets of scales and a pile of plastic baggies), and a sizeable amount of cash. Then, too, the search turned up a fully loaded firearm, widely regarded as a tool of the drug-distribution trade. See United States v. Ramirez-Frechel, 23 F.4th 69, 75 (1st Cir.), cert. denied, 142 S. Ct. 2828 (2022). Relatedly, the search yielded three loaded magazines.

The district court's finding that one of the principal uses of the apartment was as a site for the distribution of drugs is strongly supported by several pieces of evidence. For instance, the finding derives support from the variety and quantity of drugs (reminiscent of a supermarket for drug sales); the presence of drug paraphernalia, cash, and tools of the trade; the defendant's admission that he owned the entire inventory of drugs kept in the observed on the premises). See id. at 706-07. We adopt the same approach.

- 11 -

apartment; his admission that he possessed the firearm in furtherance of drug-related activities; and his admission that he controlled a drug point, which the court reasonably could infer was being run out of the apartment. We discern no clear error in the district court's finding that one principal use of the apartment was for drug distribution.

To complete the picture, we note that this finding was bolstered by the evidence adduced through surveillance of the apartment complex. Over a span of two days, officers observed three sales of controlled substances that originated from the defendant's apartment. The third sale is especially informative: a buyer went to Unit 97 to purchase a controlled substance; the Unit 97 occupant asked the buyer to wait while he went to the defendant's apartment and retrieved a bag; and the occupant then returned to complete the sale. The court reasonably could infer that the seller went to the defendant's apartment to obtain the drugs needed to complete the sale.

That ends this aspect of the matter. When all is said and done, sentencing courts are entitled to draw common-sense inferences from the evidence adduced. Because the district court supportably found both that the defendant maintained the apartment and that one of its principal uses was as the hub of a drug-distribution business, we have little difficulty in upholding the district court's application of the stash-house enhancement.

The defendant resists this conclusion. He contends that the only real evidence of drug distribution is a footnote in the amended PSI Report (footnote 7). But the defendant is looking at the record through rose-colored glasses.

The only portion of footnote 7 challenged by the defendant contains the probation office's explanation that "surveillance records reflected two incidents in which" an individual had gone to the defendant's apartment "and received drugs for further sale/distribution." The defendant attempts to debunk these surveillance records, contending that "a review of the documents on the record provide [sic] no mention of where did the probation officer retrieved this information of a surveillance record." And because there was insufficient evidence to support the probation office's factual finding regarding the surveillance of his apartment, the defendant's thesis runs, the district court should not have relied on that finding.

It is at least arguable that this claim of error has been waived. Although the defendant objected to the inclusion of footnote 7 in the original PSI Report, the probation office overruled that objection and included the footnote in the amended PSI Report. The defendant did not advance any objection to any portion of footnote 7 before the district court. That failure to register a timely objection may well portend a waiver. See United States v. Rondón-Garcia, 886 F.3d 14, 25 (1st Cir. 2018) (holding

that failure <u>timely to object</u> constitutes a waiver); <u>United States</u> v. <u>Hester</u>, 140 F.3d 753, 762 (8th Cir. 1998) (holding that defendant waived certain objections to PSI Report by failing to renew them during disposition hearing); <u>cf.</u> <u>United States</u> v. <u>Franklin</u>, 51 F.4th 391, 399-400 (1st Cir. 2022) (holding — in proceeding on revocation of supervised release — that objection raised at preliminary hearing but not renewed at revocation hearing was not preserved).

Here, however, we need not decide whether the defendant waived his claim of error. Even if we assume, favorably to the defendant, that the claim of error was not waived but merely forfeited, it cannot succeed. Appellate review of a forfeited claim is only for plain error. <u>See</u> <u>United States</u> v. <u>Duarte</u>, 246 F.3d 56, 60 (1st Cir. 2001). The district court's reliance on the PSI Report's characterization of the surveillance records was not plain error. First, the claimed error — if error at all — was not "clear or obvious." <u>Id.</u> Second, the claimed error did not affect the defendant's substantial rights. After all, the plethora of other evidence produced at sentencing, taken without regard to the surveillance evidence, was more than sufficient to ensure a finding that a principal use of the apartment was for drug distribution and that, therefore, the stash-house enhancement applied.

We summarize succinctly. We hold that a premises that serves both as a family's place of residence and as the hub of a

drug-distribution enterprise has two principal uses. The fact that one principal use is for drug distribution permits a sentencing court to impose the stash-house enhancement. And given the district court's supportable factfinding, we conclude that the court did not abuse its discretion in imposing the stash-house enhancement here.

**B**

The defendant's second claim of procedural error involves his criminal history score. Specifically, he complains that the district court erred by adding one criminal history point under USSG §4A1.2 for a prior offense — to which he allegedly pleaded guilty — that was dismissed under a diversionary program.

We need not resolve this claim of error. The PSI Report assigned six criminal history points to the defendant, placing him in CHC III. The district court accepted that placement. The defendant admits that his score includes five properly awarded criminal history points. Because five criminal history points are sufficient to place a defendant in CHC III, see USSG ch. 5, pt. A, it is evident that the disputed criminal history point played no part in establishing either the defendant's CHC or his guideline sentencing range. Any error in assigning the sixth criminal history point would, therefore, appear to be harmless. See, e.g., United States v. Battle, 637 F.3d 44, 51 (1st Cir. 2011).

We use that tentative language ("appear to be") because "an appellate court may only deem such an error harmless 'if, after reviewing the entire record, it is sure that the error did not affect the sentence imposed.'" United States v. Graham, 976 F.3d 59, 62 (1st Cir. 2020) (quoting United States v. Alphas, 785 F.3d 775, 780 (1st Cir. 2015)). We have undertaken such an examination, and we are confident that the disputed criminal history point played no part in the district court's formulation of the sentence.

In examining the record, "we seek to distinguish between a judge's reliance on facts in selecting an appropriate sentence and a judge's reliance on the significance that the Guidelines appear to assign to those facts in calculating, for example, the total offense level or criminal history category." Id.; see United States v. Goergen, 683 F.3d 1, 4 (1st Cir. 2012). Here, the record makes manifest that the district court placed no particular weight on either the diversionary disposition or the extra point in the defendant's criminal history score when fashioning the defendant's sentence. The court mentioned the diversionary disposition only once (in its explanation of why the defendant was in CHC III). When explicating its sentence, the court did not allude to that disposition in any way. Because there is nothing in the record to support an assertion that the defendant's sentence was affected by the inclusion of the sixth criminal history point, we are satisfied that any error in awarding that point was patently harmless.

C

This brings us to the defendant's claim that his sentence is substantively unreasonable. His main argument is that his sentence is substantively unreasonable because the court erroneously imposed the stash-house enhancement and, thus, increased his base offense level by two levels. But as we already have explained, see supra Part II(A), the court did not err in imposing the enhancement.

The defendant also makes a more general claim of unreasonableness. Our review of this claim is for abuse of discretion. See Holguin-Hernandez v. United States, 140 S. Ct. 762, 766-67 (2020). We recognize that in criminal sentencing, "reasonableness is a protean concept." United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008). As such, "[t]here is no one reasonable sentence in any given case but, rather, a universe of reasonable sentencing outcomes." United States v. Clogston, 662 F.3d 588, 592 (1st Cir. 2011). Our task, then, is "to determine whether the [challenged] sentence falls within this broad universe." Rivera-Morales, 961 F.3d at 21.

The defendant's sentence has two constituent parts: an eighty-seven-month sentence on count 2 (the drug-distribution count) and a consecutive sixty-month sentence on count 4 (the firearms count). The latter sentence is a mandatory minimum

sentence, see 18 U.S.C. § 924(c)(1)(A)(i), so the defendant's challenge is necessarily directed to his sentence on count 2.

The defendant's sentence on count 2 is at the low end of the guideline sentencing range for that count. Where, as here, a challenged sentence falls within a properly calculated guideline sentencing range, the defendant "faces a steep uphill climb to show that the length of the sentence is unreasonable." United States v. deJesús, 6 F.4th 141, 150 (1st Cir. 2021). That climb becomes even steeper when — as in this case — the challenged sentence is at the very bottom of the guideline range. See United States v. Demers, 842 F.3d 8, 15 (1st Cir. 2016).

In the last analysis, a sentence will fall within the universe of reasonable sentencing outcomes as long as it rests on "a plausible rationale and . . . represents a defensible result." Rivera-Morales, 961 F.3d at 21. The sentence challenged here rests on a plausible rationale. The district court considered the relevant section 3553(a) factors and the parties' sentencing recommendations. The court determined "that the sentence recommended by the parties d[id] not reflect the seriousness of the offense, d[id] not promote respect for the law, d[id] not protect the public from further crimes by [the defendant], and d[id] not address the issues of deterrence and punishment." Instead, the court concluded that the possession of heroin, cocaine, fentanyl, and marijuana, the presence of a loaded firearm

- 18 -

in a child's bedroom, and other evidence of drug distribution warranted a sentence within the applicable guideline range. We deem this rationale plausible.

In addition, the challenged sentence represents a defensible result. The defendant was found in his apartment with four children. Law enforcement officers retrieved quantities of various drugs from the apartment. Officers also retrieved a loaded firearm and several loaded magazines. The defendant admitted to owning all of the drugs, the firearm, and the ammunition. Last — but far from least — the defendant admitted that he controlled a drug point in the housing project. Given these circumstances, a sentence at the low end of the guideline sentencing range is wholly defensible.

Because the challenged sentence rests on a plausible rationale and reflects a defensible result, it is substantively reasonable. The defendant's claim of error therefore fails.

**III**

We need go no further. For the reasons elucidated above, the challenged sentence is

**<u>Affirmed</u>**.