# United States Court of Appeals

### For the Eighth Circuit

_____

No. 24-1573

_____

United States of America

*Plaintiff - Appellee*

v.

Emiliano Nava Munoz

*Defendant - Appellant*

_____

No. 24-1574

_____

United States of America

*Plaintiff - Appellee*

v.

Ashley Chacon

*Defendant - Appellant*

_____

No. 24-1670

_____

United States of America

*Plaintiff - Appellee*

v.

Valentin Nava Munoz

*Defendant - Appellant*
_____

Appeals from United States District Court
for the Southern District of Iowa - Central
_____

Submitted: March 20, 2025
Filed: April 15, 2025
_____

Before GRUENDER, BENTON, and SHEPHERD, Circuit Judges.
_____

BENTON, Circuit Judge.

Ashley Chacon pled guilty to possession with intent to distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). Emiliano Nava Munoz and Valentin Nava Munoz pled guilty to conspiracy to distribute, and to distribution of 50 grams or more of meth in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. The district court[1] sentenced Chacon, Emiliano, and Valentin to 60, 280, and 180 months in prison, respectively. They appeal. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

I.

Suspecting drug trafficking, an officer stopped Chacon for speeding. The officer asked about her rental car, travel plans, and the traffic violation. Chacon joined the officer in his patrol car, where he asked more questions while typing on

_____

[1]The Honorable Stephanie M. Rose, Chief Judge, United States District Court for the Southern District of Iowa.

his computer. Within about five minutes and twenty seconds, another officer arrived. His drug-detection dog performed an open-air sniff. The dog alerted at the rear of the car. The dog made brief contact with the car's exterior. While the first officer completed the write-up, the second officer informed Chacon of the alert. She responded that the car contained a "little bit" of cocaine. The officers searched the car, finding over 50,000 grams of meth.

Chacon challenges the district court's denial of her motion to suppress evidence from the car search. "We review the district court's findings of fact under the clearly erroneous standard, and the ultimate conclusion of whether the Fourth Amendment was violated is subject to *de novo* review." **United States v. Holly**, 983 F.3d 361, 363 (8th Cir. 2020). "We will reverse a finding of fact for clear error only if, despite evidence supporting the finding, the evidence as a whole leaves us with a definite and firm conviction that the finding is a mistake." **Id.** (cleaned up).

Chacon argues the traffic stop was impermissibly extended. An officer may make "ordinary inquiries incident to the traffic stop," such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." **Rodriguez v. United States**, 575 U.S. 348, 355 (2015) (cleaned up), *applying* **Illinois v. Caballes**, 543 U.S. 405, 408 (2005). "An officer also may request that the driver sit in the patrol car to answer questions and may ask questions about his itinerary." **United States v. Englehart**, 811 F.3d 1034, 1040 (8th Cir. 2016) (cleaned up). But "law enforcement cannot unlawfully extend a traffic stop to allow a drug-sniffing dog to check for narcotics after the traffic violation has already been addressed." **United States v. Mosley**, 878 F.3d 246, 253 (8th Cir. 2017). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." **Rodriguez**, 575 U.S. at 354.

The officer's questions here were "ordinary inquiries." He worked to address the traffic violation before and during the sniff, taking a reasonable time to complete the related tasks. The district court did not clearly err by finding "the traffic stop

was not prolonged beyond the time reasonably required to complete the original purpose of the stop." Because the stop was not impermissibly extended, it did not violate the Fourth Amendment.

Chacon argues the dog's contact with the car was an unlawful trespass, thus an unreasonable search. "The use of a well-trained narcotics-detection dog . . . during a lawful traffic stop, generally does not implicate legitimate privacy interests." *Caballes*, 543 U.S. at 409. "Absent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment." *United States v. Lyons*, 486 F.3d 367, 373 (8th Cir. 2007) (holding a drug dog sticking his head through an open window was not a search because the dog did so "on his own" and "was not directed" to do so).

The district court did not clearly err by finding "no convincing evidence to show that the trooper directed the drug dog to make any physical contact with the vehicle." "[V]ideo footage instead supports the Government's position that the drug dog acted instinctively when the points of contact were made." Because the dog acted instinctively, his contact with the car did not violate the Fourth Amendment.

True, since *Lyons*, this court has cast doubt on the dog-instinct versus officer-conduct distinction because "the subjective intent of police officers is almost always irrelevant to whether an action violates the Fourth Amendment." *United States v. Pulido-Ayala*, 892 F.3d 315, 319 (8th Cir. 2018), *citing* *Ashcroft v. al-Kidd*, 563 U.S. 731, 736–37 (2011). Nevertheless, when, as here, "the dog's alert alone, without" the instinctive act "would have given [officers] probable cause to search . . . the inevitable discovery doctrine justifies[s] admitting evidence." *Id.*

II.

Emiliano challenges enhancements to his sentence. The court reviews "*de novo* the legal conclusions a district court reaches in order to apply an enhancement for purposes of calculating an advisory guidelines range . . . while factual findings

underpinning the enhancement are reviewed for clear error." *United States v. Collins*, 754 F.3d 626, 629 (8th Cir. 2014) (cleaned up).

Emiliano disputes the district court's application of an enhancement for maintaining the premises of King Avenue and Amherst Street. U.S.S.G. § 2D1.1(b)(12) imposes a two-level enhancement "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." Emiliano contends he used King Avenue for lawful purposes—as his primary residence—never using the premises for distribution purposes. Drug trafficking must be "one of the defendant's primary or principal uses" of the property, rather than "incidental or collateral uses" for this enhancement to apply. **U.S.S.G. § 2D1.1(b)(12)** cmt. n.17. Rather than compare the "frequency of lawful and unlawful uses in this type of case," this court applies § 2D1.1(b)(12) "when a defendant uses the premises for the purpose of substantial drug-trafficking activities, even if the premises was also her family home at the times in question." *United States v. Miller*, 698 F.3d 699, 707 (8th Cir. 2012). In *Miller*, a defendant used the premises as her family home, while also conducting "at least three controlled buys" and "accepting payments that she knew were for methamphetamine purchases" on the property. *Id.* at 706. Because she "used the premises for the purpose of actively participating" in drug manufacturing or distribution, the enhancement applied. *Id.* Emiliano used King Avenue to: store $115,000 of drug proceeds and a distribution-quantity of cocaine, and try to recruit an undercover officer there. These substantial drug-trafficking activities support the enhancement, despite King Avenue also serving as Emiliano's residence.

Emiliano contends he did not maintain or control access to Amherst Street. "Among the factors the court should consider in determining whether the defendant 'maintained' the premises are (A) whether the defendant held a possessory interest in (e.g., owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises." **U.S.S.G. § 2D1.1(b)(12)** cmt. n.17. In *Garcia*, the enhancement applied to a defendant without a possessory interest because he had "free access to the premises" and handled chores, including

mowing the lawn and taking out the trash. *United States v. Garcia*, 774 F.3d 472, 475 (8th Cir. 2014). The individual responsible for rent and utilities "was rarely at the premises." *Id.* Likewise, Emiliano freely accessed the property. During months of surveillance, law enforcement saw only Emiliano and Valentin entering the premises (except once when they saw Emiliano's "paramour"). Emiliano visited the "stash house" immediately before multiple controlled buys to pick up drugs. His defense that he did not mow the lawn or take out the trash is unavailing (particularly when nobody lived there). The district court did not clearly err by concluding Emiliano "most actively control[led] and access[ed]" Amherst Street. Thus, he "maintained drug premises at two locations; not only the Amherst location, but also his own residence on King Avenue."

Emiliano disputes the district court's application of a role enhancement. U.S.S.G. § 3B1.1(b) imposes a three-level enhancement "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." "Factors the court should consider include the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." **U.S.S.G. § 3B1.1(b)** cmt. n.4. "We have defined the terms 'manager' and 'supervisor' quite liberally, holding that a defendant can be subject to this enhancement for having managed or supervised only one other participant in the criminal conspiracy." *Garcia*, 774 F.3d at 476 (cleaned up).

Evidence of Emiliano's role included an undercover officer's testimony that Emiliano directed the "higher-level" agenda; recordings of Emiliano trying to recruit accomplices; and a shoebox of cash with a note allocating a larger share of the fruits

-6-

to Emiliano. The district court did not clearly err by finding Emiliano "was a manager or supervisor of a criminal activity that involved five or more participants."[2]

## III.

Like Emiliano, Valentin challenges his sentence based on the district court's application of a role enhancement. *See* **U.S.S.G. § 3B1.1(b)**. "There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." **USSG § 3B1.1** cmt. n.4. "The manager or supervisor enhancement may apply even if the management activity was limited to a single transaction." *United States v. Lopez*, 431 F.3d 313, 318 (8th Cir. 2005). In at least one instance, Valentin directed Emiliano to complete a transaction, advising him about the amount of meth and meeting location. Further, Valentin "repeatedly tried to recruit others into the offense." The district court appropriately enhanced his sentence.

\* \* \* \* \* \* \*

The judgments are affirmed.

_____

---

[2]The district court correctly found that the conspiracy involved at least five participants: Emiliano, Valentin, Chacon, Jesus Morales Murillo, Angel Donato Montoya, and Armando Garnica Aguilera.